ERIC L. AND SHEILA P. CLAYDEN, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 28767-85, 35680-85, 38135-85, 41090-85.      Filed April 11, 1988.

---

[1]Cases of the following petitioners are consolidated herewith: James Edward Spann and Barbara Anne Spann, docket No. 35680-85; Phillip R. Hurlbut and Bernice P. Hurlbut, docket No. 38135-85; and Eric L. and Sheila P. Clayden, docket No. 41090-85.

Eric L. Clayden, Phillip R. Hurlbut, and James Edward Spann, pro se.
*Terrence D. Woolston*, for the respondent.

OPINION

FEATHERSTON, *Judge*: These consolidated cases were assigned to Special Trial Judge Marvin F. Peterson pursuant to section 7456(d)[2] (redesignated as section 7443A(b) by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1556, 100 Stat. 2755), and Rules 180, 181, and 183.[3] The Court agrees with and adopts his opinion which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

PETERSON, *Special Trial Judge:* These consolidated cases were selected by the parties and approved by the Court to serve as test cases for resolving issues common to a larger group of taxpayers who invested during the years in issue in a venture marketed by BCSI for the production, marketing, and distribution of videotapes (sometimes hereinafter referred to as the videotape program). Respondent determined deficiencies and additions to tax in petitioners' Federal income taxes as follows:

ERIC L. AND SHEILA P. CLAYDEN
Docket Nos. 28767-85, 41090-85

| | | Additions to tax | | | |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6661 |
| 1981 | $13,699 | $3,387.12 | $684.95 | (*) | 0 |
| 1982 | 5,187 | 0 | 3,259.35 | (*) | $6,518.70 |
| 1983 | 101,345 | 25,336.25 | 5,067.25 | (*) | 10,134.50 |

---

[2]All section references are to the Internal Revenue Code of 1954 as amended, unless otherwise indicated.

[3]All Rule references are to the Tax Court Rules of Practice and Procedure.

PHILLIP R. HURLBUT AND BERNICE P. HURLBUT
Docket No. 38135-85

| | | Additions to tax | |
| Year | Deficiency | Sec. 6653(a)(1) | Sec. 6653(a)(2) |
|---|---|---|---|
| 1981 | $691 | $34.60 | (*) |
| 1982 | 1,941 | 97.05 | (*) |
| 1983 | 4,092 | 204.60 | (*) |

JAMES EDWARD SPANN AND BARBARA ANNE SPANN
Docket No. 35680-85

| | | Additions to tax | | | |
| Year | Deficiency | Sec. 6653(a)(1)[4] | Sec. 6653(a)(2) | Sec. 6659 | Sec. 6661 |
|---|---|---|---|---|---|
| 1979 | $5,825 | $291.25 | 0 | $1,747.50 | 0 |
| 1980 | 8,267 | 413.35 | 0 | 2,480.10 | 0 |
| 1982 | 10,043 | 502.15 | (*) | 0 | $1,004.30 |
| 1983 | 12,989 | 649.45 | (*) | 572.40 | 1,108.10 |

Respondent also determined that all petitioners were liable for additional interest for all taxable years under the provisions of sec. 6621(c),[5] except for petitioners Hurlbut for 1981.

*50 percent of the interest due on the tax deficiency determined for the year in issue.

The issues for decision are (1) whether and to what extent petitioners are entitled to deductions and credits with respect to their participation in the videotape program; and (2) whether petitioners are liable for additional interest and the additions to tax as set forth above. Our disposition of these issues will be dispositive of all dockets except docket No. 38135-85 which involves issues unrelated to the videotape program involved herein.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact and exhibits attached thereto are incorporated herein by this reference. At the time their respective petitions were filed in these cases, all petitioners were residents of the State of Arizona.

---

[4]We note that what was formerly sec. 6653(a), as amended, became sec. 6653(a)(1), effective for those taxes for which payment is due after Dec. 31, 1981. Sec. 722(b)(1) and (2), Economic Recovery Tax Act of 1981, 95 Stat. 342.

[5]Subsec. (d) of sec. 6621 was redesignated subsec. (c) and amended by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1511(c)(1)(A)-(C), 100 Stat. 2744.

Vitagram, Inc. (Vitagram), Teledent, Inc. (Teledent), and Media Mark, Inc. (Media Mark), are California corporations controlled by Laree Graves (Laree), and her husband, Arthur Graves (Arthur). Consulmac, Inc. (Consulmac), is a California corporation controlled by Laree's sister, Velda Wightman, and her nephew, Van Whipple.

During the years in issue, petitioners each executed agreements with Vitagram, Teledent, and Consulmac. The deductions and credits claimed were based on these agreements which form the basis of this dispute. Under the terms of the agreements, Vitagram was to produce one or more master videotapes on behalf of the investors, Teledent was to market and distribute the videotapes (primarily as television programming), and Consulmac was to oversee the performance by Vitagram and Teledent of their respective obligations under the agreements and to manage the revenue generated for the investor by such activities.

The videotape program was promoted as a means by which an investor could become a producer and distributor of videotapes for commercial television thereby allowing the investor to qualify for an advertising expense deduction and the investment credit for films. To obtain the immediate maximum tax benefit, contracts were drafted to create an advertising expense deduction in an amount equal to the investor's income for the year in which the individual investment was made and to create an investment credit sufficient in amount to allow a refund of all taxes paid for the previous 3 tax years.

## The Agreements

Petitioners each executed one or more agreements with Vitagram entitled "Television Property Purchase Agreement" (purchase agreement). Pursuant to the purchase agreement, Vitagram was required to "develop and produce" for the investor one or more master videotapes "identified in the Material Description attached hereto as Exhibit 'A' and made a part hereof." None of the purchase agreements, however, actually had an "Exhibit 'A,'" or other description of the videotapes purchased attached to it at the time such agreements were executed by petitioners. The number of videotapes to be purchased under the

contract, and the content of such videotapes, was completely within the discretion of Vitagram. Additionally, the purchase agreement did not specify a time in which Vitagram was required to produce and deliver such videotapes.

The contract price under the purchase agreement for Vitagram's services was set at 15 times[6] the total amount of investment credit desired by the investor. Concomitantly, the investor was required to make a downpayment under the purchase agreement equal in amount to the investment credits expected to be generated by such agreement. However, in lieu of making a cash payment for the downpayment, the investor would execute a promissory note for such amount. The promissory note was typically due within 6 months and provided a 10-percent rate of interest. It was the understanding of the parties that the note for the downpayment would be paid to Vitagram upon receipt by the investor of his income tax refunds generated from the investment credit created by the purchase agreement. The balance of the contract price was due in 3 years with interest computed at 10-percent per annum. Pursuant to the agreement, Vitagram was granted a security interest in the videotapes and in the distribution contract with respect to such videotapes. Further, Vitagram was assigned all income from the videotapes until the full contract price was paid. The agreement provided that delivery of the videotape to the investor was complete when the videotape was placed by Vitagram in vault storage in the investor's name. Such storage was at Vitagram's election and expense until full payment was made by the investor under the contract. However, the investor was to be permitted access to the master videotape in order to duplicate it for purposes of distribution and commercial exploitation. The purchase agreement further provided that upon delivery of the master videotape, "[Vitagram] shall no longer look to [the investor] for the unpaid balance hereof." The agreement also

---

[6]Such rule of thumb was used by petitioner Eric Clayden in his sales presentations to potential investors (see our findings with respect to petitioner Eric Clayden, *infra*), since the investment credit for qualified television films was 10 percent of the applicable percentage of qualified U.S. production costs. See sec. 48(k). The applicable percentage under sec. 48(k)(2) is 66⅔ percent. Thus, in accordance with sec. 48(k), qualified production costs are 15 times the amount of investment credit yielded by such costs.

provided that, "[Vitagram] is not restricted nor limited to the tape(s) as its source of payment." Finally, the agreement provided that it was to be interpreted under California law.

In conjunction with each purchase agreement, petitioners also executed a "distribution agreement" with Teledent, granting to Teledent exclusive worldwide distribution rights with respect to the videotapes described in "Exhibit 'A.'" At the time the distribution agreements were executed by petitioners, neither Exhibit A nor any other description of the videotapes to be distributed was included in or with such agreements.

In the typical case, the fee to be paid by the investor to Teledent for "distribution * * * , promotion and advertising" was established under the agreement at an amount which was expected to reduce to zero the investor's anticipated tax liability for the then current taxable year. Similar to the purchase agreement, the cash downpayment under the distribution agreement was typically set at an amount approximating the expected tax benefit of such agreement. Also, the investor was expected to execute a promissory note in lieu of a cash downpayment. The promissory note was typically due within 6 months and provided for interest at a 10-percent rate. The understanding of the parties was that the promissory note would be satisfied with the tax refund generated by the advertising expense deduction created by the distribution agreement. In some cases, the investor was advised to adjust his income tax withholding to zero in accordance with the intended effect of the distribution agreement to eliminate any income tax liability. In such cases, the promissory note would call for periodic payments in amounts roughly equal to the resulting reduction in withholding taxes.

Teledent was to receive 20 percent of all revenues earned by the videotapes until the revenues received by the investor equaled the combined total of the contract amounts of the purchase agreement and the distribution agreement.[7] Thereafter, the distribution agreement provided that Teled-

---

[7]For example, if an investor entered into a purchase agreement for $120,000 and a distribution agreement for $45,000, Teledent would, in addition to the $45,000 amount, receive 20 percent of all revenue earned until such time as the investor had received $165,000 from revenue generated by the videotapes covered by the agreements.

ent was to receive 80 percent of the revenues generated by the videotapes it distributed.

In some instances, contracts were received by Vitagram and Teledent without the accompanying promissory notes. The absence of such notes was ignored by Vitagram and Teledent.

Investors also entered into a "Management and Consulting Agreement" (hereinafter referred to as the management agreement) with Consulmac. Under this agreement, Consulmac was appointed as the investor's "attorney-in-fact" with the power "to perform any and all acts desired by CLIENT (the investor), and deemed necessary for the organization, promotion, development, and operation of CLIENT's business" including the authority "to establish an operating bank account for CLIENT, with signature rights for Consulmac as well as CLIENT." The management agreement further provided:

CONSULMAC is specially authorized to negotiate loans and credits acceptable to CLIENT for the conduct of the affairs of this representation; to collect and disburse all funds in relation to the business activities conducted by CONSULMAC for CLIENT; arrange for accounting, tax preparation and legal representation, if necessary, in connection with CONSULMAC's representation of CLIENT.

Consulmac's fee for services performed by it under the management agreement was set at 5 percent of the "net profit" from the venture. The agreement, however, does not define the term "net profit."

Pursuant to the management agreement, Consulmac established a checking account (DBA account) on behalf of each investor at Security Pacific National Bank (Security Pacific) located in Citrus Heights, California. Security Pacific closed all such DBA accounts during October of 1983 because of lack of personal contact or knowledge of the individual depositors. Investor accounts were thereafter handled by Comaxis, Inc., a California banking corporation controlled by Laree and her nephew, DeWayne Whipple.

## Operation of the Program

Laree directed the daily operations of Vitagram, Teledent, and Media Mark. Prior to the founding of such companies, neither she nor Arthur had any experience in the music or

television industries. Media Mark was incorporated on September 15, 1979. Vitagram and Teledent, initially trade names of Media Mark, were incorporated on May 18, 1981. At least 90 percent of the business of such corporations involved program investors such as petitioners in the instant cases.

Vitagram did not own the necessary equipment for the production of videotapes. Instead, it was Vitagram's practice to subcontract the actual production of videotapes to unrelated commercial studios. The studio used most often for this purpose was Superior Video (Superior), located next door to the offices of Vitagram in North Hollywood, California. Superior also performed post-production work for Vitagram, consisting of editing of videotapes and making copies of them.

Performing artists (usually musicians) were located and selected for videotaping in one of several ways. Sometimes the performing artists were selected by the subcontracting studio. Other performers were located through efforts made by employees of Vitagram. Between 1982 and 1984, some performers were located through the efforts of International Entertainment Management Corp. (IEMC), a California corporation owned by Laree and her brother, Cale Whipple.

Most of the performers appearing on Vitagram videotapes were not paid for their services, except they did receive a free copy of their videotape. They were also required to sign releases with respect to the videotape performances.

On or about April 26, 1982, Vitagram contracted with Nevin Fleet for the performance of art instruction (painting) in a series of half-hour videotapes. Approximately 1 dozen of such videotapes were produced on April 27 and 28 of 1982. One such videotape, entitled "The Songsters," was provided to petitioner James E. Spann pursuant to his purchase agreement with Vitagram dated October 11, 1982. Mrs. Fleet was paid $200 for her performance and, in addition, she was to receive 25 percent of the "net profits" from the commercial use of the videotape. As of the time of trial, no revenue had been generated by the videotapes in which Mrs. Fleet performed.

Vitagram did not keep records to reflect its costs associated with the production of individual videotapes, nor

do its records reflect how much the investors were charged for an individual videotape where more than one videotape was purchased with respect to a particular purchase agreement. In such cases, Vitagram would produce as many videotapes as Laree believed were necessary to fulfill Vitagram's obligation under the purchase agreement, but no videotapes were individually valued. Instead, Laree charged the investor for such videotapes based upon her arbitrary assessment of the value of Vitagram's services as a total package since no economic standards were established.

Teledent hired New Horizons, an unrelated entity, to distribute the videotapes to the television market. Through New Horizons, Teledent purchased a 1 hour time slot on the SPN network and on 10 Arizona television stations for a combined total cost of $4,300 per week. In this time slot, Teledent aired a show entitled "The Fastlane" for 56 weeks beginning in January 1984. "The Fastlane" combined some of the Vitagram videotapes into a television show format, i.e., with spaces for commercials, the superimposition of credits, an announcer's voiceover, and the addition of "canned" applause.

Media Mark's function was to sell the advertising slots associated with the air time Teledent had purchased. Advertising revenue generated by Media Mark with respect to "The Fastlane" totaled less than $10,000.

Neither Teledent nor Vitagram kept records to reflect which videotapes had been broadcast on "The Fastlane." Teledent has never received any income with respect to the Vitagram videotapes it distributed. Nevertheless, Teledent made "advance distribution payments" to the bank accounts which were established and managed on behalf of the investors by Consulmac. In most instances, Consulmac immediately made payments with such funds to either Teledent or Vitagram, and the investor was given a corresponding credit with respect to his outstanding obligations to Teledent and to Vitagram.

Teledent's funds were depleted by early 1985 since many investors had by then ceased making payments on their obligations to Vitagram and Teledent. Neither Vitagram nor Teledent has ever made any effort to collect the balances due on the notes from the investors.

At the time of the trial in these cases Teledent, Vitagram, and Media Mark were inactive and their corporate powers had been suspended by the state of California.

## *Eric Clayden*

Petitioner Eric Clayden (Clayden), doing business as BCSI, was instrumental in the promotion of the Vitagram videotape program during the years 1981 through 1984. Clayden was introduced to the program during 1980 by Van Whipple, president of Consulmac. BCSI began marketing the program in 1981 and received sales commissions of 20 percent to 25 percent of the downpayments made by investors pursuant to their Vitagram and Teledent contracts. Such commissions were paid by Vitagram during 1981 and thereafter by Consulmac. BCSI received commissions from such activities during 1981, 1982, and 1983 in the amounts of $93,669, $279,744, and $490,713, respectively.

Clayden's sales presentation of the program to potential investors was primarily oral. In his presentations, he told potential investors that the amount of the purchase agreement with Vitagram could be calculated simply by multiplying the total amount of Federal income taxes paid during the prior 3-year period by 15. Clayden explained that the amount of the contract would yield an investment credit sufficient to obtain the tax refunds and that the refunds so obtained would be used as the investor's downpayment with respect to the purchase agreement. Clayden also explained to potential investors that the amount of the distribution agreement with Teledent should approximate the investor's current year's taxable income in order to produce a complete refund of all income taxes paid during the year. The amount of the distribution agreement bore no relationship to the amount of the purchase agreement.

No financial statements or other financial information were sought or obtained from the investors prior to their entry into the program.

Clayden reported net profits from BCSI on Schedule C of his Federal income tax returns for 1981, 1982, and 1983 in the amounts of $40,831, $163,575, and $248,399, respectively.

Clayden invested in the videotape program during 1981, 1982, and 1983. During such years, Clayden entered into five purchase agreements (V-1 through V-5) with Vitagram and five distribution agreements (T-1 through T-5) with Teledent. The following chart sets forth pertinent information with respect to these agreements:

| Description of contract | Date | Total contract amount | Downpayment stated in contract | Amount of promissory note |
|---|---|---|---|---|
| V-1 | 12/15/81 | $21,000 | 0 | None |
| T-1 | 12/15/81 | 40,900 | $13,600 | $13,600 |
| V-2 | 12/28/82 | 425,000 | 0 | None |
| T-2 | 12/28/82 | 183,000 | 90,000 | 90,000 |
| V-3 | 12/28/82 | 161,625 | 10,775 | 10,775 |
| T-3 | 12/28/82 | 20,450 | 4,820 | 20,450 |
| V-4 | 12/29/82 | 319,000 | 17,500 | 17,500 |
| T-4 | 12/29/82 | 29,800 | 7,700 | 29,800 |
| V-5 | 09/09/83 | 540,000 | 0 | None |
| T-5 | 09/09/83 | 254,000 | 129,800 | None |

With the exception of contract T-5, Clayden executed promissory notes in lieu of making cash downpayments with respect to the contracts. In the case of contract T-5, Clayden neither made the cash downpayment required by the contract nor did he execute a promissory note for the downpayment. The promissory notes and all amounts associated with contracts V-1 through V-5 provided for interest at 10-percent per annum. No interest was required under contracts T-1 through T-5.

The above chart shows that Clayden entered into contracts with Vitagram and Teledent in the total amount of $1,994,775. No interest has been paid with respect to the promisory notes. Clayden has been credited by Vitagram and Teledent with making payments on such contracts in the total amount of no more than $64,843.[8] Some of the payments were made by Consulmac on behalf of Clayden with the funds received from Teledent as "advance distribution payments." Consulmac made such payments to Teledent and to Vitagram from Clayden's DBA account. Clayden

---

[8]Other evidence in the record indicates that the amounts credited as payments total only $54,062.50, while still other evidence indicates that the amounts credited by Teledent and Vitagram with respect to the contracts in question was $42,843.

could not write checks nor withdraw funds from the account.

Before investing in the program, Clayden did not investigate the backgrounds of the principals involved nor did he independently examine its profit potential. Clayden relied upon the representations of Van Whipple that a market existed for the videotapes produced by Vitagram.

Clayden received from Vitagram a total of 15 videotapes consisting of musical performances by various unknown performing artists. Based upon this record it cannot be determined which videotapes were produced with respect to each of Clayden's five purchase agreements, nor can it be determined how much Vitagram charged Clayden with respect to each such videotape. It also cannot be ascertained upon this record when Clayden's videotapes were produced nor when, if ever, any of his videotapes were broadcast.

On his Federal income tax returns for 1981, 1982, and 1983, Clayden reported gross income from his videotapes in the amounts of $25, $18,200, and $200, respectively, and net losses in the amounts of $40,875, $229,399, and $254,397, respectively. Clayden also claimed investment credits for 1981, 1982, and 1983 with respect to his videotapes in the amounts of $1,401, $60,375, and $36,000, respectively.

## Phillip Hurlbut

Petitioner Phillip Hurlbut (Hurlbut) has owned Carefree Business Services (Carefree), a sole proprietorship, since 1976. Carefree has provided income tax preparation services and financial planning from its inception until the present time. Prior to investing in the program, Hurlbut had no experience in the production and distribution of television videotapes.

During 1981, Hurlbut was introduced to the program by Clayden. Hurlbut subsequently became involved in the program both as an investor and in marketing it to his Carefree clients. Prior to investing in the program, Hurlbut, on a routine trip to North Hollywood, visited the studio of Superior and observed its post-production equipment. At the time Hurlbut visited the studio, the equipment was not

in operation. Hurlbut also researched the income tax effect with respect to the investment tax credit and depreciation of the videotapes. He photocopied certain portions of the Internal Revenue Code and respondent's T.D. 7609, 1979-1 C.B. 47, pertaining to investment credit for movie and television films. He then instructed Clayden to ascertain from Vitagram and Teledent whether the program would qualify for these tax benefits. Clayden later related to Hurlbut that Vitagram and Teledent claimed that the program was in compliance with the requirements of the tax law.

Hurlbut estimated that one videotaped musical performance would generate $48,000 of gross income for him if it were shown once on each of approximately 1,000 television stations in the United States. Utilizing data he found in the "Standard Rate and Data Service," Hurlbut estimated that the average amount of advertising revenue generated by a 1 hour television show would, on the average, exceed by $600 the price a television station would charge a distributor (such as Teledent) to broadcast such a show in an average-priced time slot. Hurlbut then assumed that the show would air on 1,000 television stations, which would result in total revenues in the amount of $600,000. Hurlbut further assumed that his videotape would constitute 10 percent of the musical content of the show which would produce $60,000 for him. After deducting Teledent's 20-percent distribution fee, Hurlbut arrived at his estimated gross profit of $48,000 from the videotape. Prior to investing in the program, Hurlbut did not investigate either the personal or business backgrounds of the principals involved.

On December 8, 1982, Hurlbut executed a purchase agreement, a distribution agreement, and a management agreement. The purchase agreement was in the amount of $15,000. It required a cash downpayment of $700, and the balance was due in 3 years, with interest computed at 10 percent per annum. However, Hurlbut did not make the downpayment upon execution of such agreement. The distribution agreement was in the amount of $14,100 and required a cash downpayment of $1,100 with the balance due in 1 year. In lieu of making the cash downpayment, Hurlbut executed a promissory note payable to Teledent in

the amount of $1,100. It provided that $100 was due by December 31, 1982, and the balance by April 15, 1983, with interest at 10 percent per annum.

During April and May of 1983, Hurlbut made payments with respect to his distribution agreement in the total amount of $1,002.35. Although additional payments have been credited to Hurlbut's account by Teledent, the source of these amounts was "advance distribution payments" by Teledent to his DBA account. As of October 1984, Hurlbut had been credited by Teledent with having made principal payments in the total amount of $1,424.20. With respect to the purchase agreement, Hurlbut has never made a payment. However, Vitagram credited Hurlbut with a principal payment during 1984 in the amount of $74. The source of this payment was an "advance distribution payment" by Teledent to his DBA account. Hurlbut has never made any interest payments with respect to his obligations to Teledent and Vitagram. Teledent and Vitagram have not demanded payment by Hurlbut of his outstanding obligations under the distribution agreement and the purchase agreement, respectively.

After investing in the program, Hurlbut occasionally visited the offices of Teledent and Vitagram whenever he traveled to North Hollywood. On several occasions, Hurlbut visited the Audio Video studio located in Phoenix, Arizona, when Vitagram was making videotapes. Hurlbut also read the reports periodically furnished to him by Consulmac regarding activity in his DBA account. Hurlbut did not attempt at any time to determine what efforts were being made on his behalf to promote his videotape.

Pursuant to the purchase agreement, Hurlbut received from Vitagram a videotape of two unknown musicians performing a song entitled "Back to Back." Based upon this record, it cannot be ascertained when such videotape was produced, nor can it be determined whether it was ever placed in a television show format or if it was ever a part of any television broadcast. On his Federal income tax return for 1982, Hurlbut reported gross income from his videotape in the amount of $25, and a net loss in the amount of $14,002. Hurlbut claimed deductions with respect to the videotape for depreciation and "marketing & distribution"

in the amounts of $27 and $14,000, respectively. Hurlbut also claimed an investment credit in the amount of $1,000. Hurlbut carried a portion of such investment credit back to the 1981 taxable year, and made a claim for refund on April 11, 1983, in the amount of $691.

On his Federal income tax return for 1983, Hurlbut reported gross income from his videotape in the amount of $75 and a net loss in the amount of $24. The deductions Hurlbut claimed with respect to his videotape were bank service charges in the amount of $22 and depreciation in the amount of $77.

### James E. Spann

Petitioner James E. Spann (Spann) has been employed since 1982 as a "shift engineer" at a paper mill. Spann is a high school graduate and, prior to his involvement in the videotape program, had no experience in the field of television broadcasting or videotape production. Spann was introduced to the program by a fellow employee who put Spann in contact with Sandy Johnson, (Johnson) a BCSI salesman.

Spann based his decision to invest in the program solely upon Johnson's sales presentation, and made no attempt to verify any of the information presented by Johnson. On October 11, 1982, Spann executed a purchase agreement, a distribution agreement, and a management agreement. At the time Spann entered into such agreements, his net worth was approximately $95,000. The purchase agreement with Vitagram was in the amount of $120,000, and required a cash downpayment of $8,000. The balance was due on the contract in 3 years together with 10-percent interest per annum. In lieu of a cash downpayment, Spann executed a promissory note payable to Vitagram in the amount of $8,000, due on or before April 15, 1983, together with interest at 10 percent per annum.

Spann's distribution agreement with Teledent was in the amount of $38,600, and required a cash downpayment of $12,400, with the balance due in 1 year. In lieu of the cash downpayment, Spann executed a promissory note payable to Teledent in the amount of $12,400. The promissory note was to be paid in semi-monthly installments commencing

November 1, 1982, in the amount of $600 each, and the balance was due on or before April 15, 1983, together with interest at 10 percent per annum.

Shortly after entering into the above-described agreements, Spann reduced his withholding taxes to zero. It was Spann's understanding that he would make the $600 semimonthly payments on his Teledent promissory note with the amounts obtained through such reduced income tax withholdings.

On October 15, 1983, Spann entered into a second purchase agreement and a second distribution agreement in the amounts of $120,000 and $37,800, respectively. The purchase agreement required a cash downpayment of $8,000, and the balance was due in 3 years with interest at 10 percent per annum. In lieu of the cash downpayment, Spann executed a promissory note payable to Vitagram in the amount of $8,000 due October 15, 1984, with interest at 10 percent per annum. The distribution agreement required a cash downpayment of $12,000, and the balance was due in 1 year. In lieu of the cash downpayment, Spann executed a promissory note payable to Teledent in the amount of $12,000. The promissory note required semi-monthly payments in the amount of $450, but did not recite the date such payments were to commence. The note also required that the balance was due on or before October 15, 1983, which was also the date that the promissory note was executed. The promissory note further required interest at 10 percent per annum.

After investing in the program, Spann did not contact Vitagram, Teledent, or Consulmac to determine the status or progress of his investment. However, Spann did occasionally speak with Clayden to inquire "Is it still working[?]."

Pursuant to the two purchase agreements, Spann received four videotapes. On this record it cannot be determined which videotapes are associated with each of the purchase agreements, nor can it be determined when the videotapes were produced. Further, it cannot be determined on this record whether the videotapes were ever used in a broadcast. Spann has received no income from his videotapes, although he has on several occasions been credited by Teledent with "advance distribution payments."

Spann's contracts with Vitagram and Teledent total $316,400 in amount. Spann has been credited by Vitagram and Teledent with total payments on such contracts in the amount of $37,633. A portion (indeterminable on this record) of such payments was made by Consulmac and the balance was "advance distribution payments" made by Teledent to Spann's DBA account.

On his 1982 Federal income tax return, Spann reported gross income from his videotapes in the amount of $25, and a net loss in the amount of $38,612. Among the deductions claimed with respect to such videotapes were advertising expense (based upon the distribution agreement) in the amount of $38,600 and depreciation expense in the amount of $25, using the income forecast method of depreciation. Spann also claimed an investment credit on his 1982 return in the amount of $8,000. Based upon the amount of the investment credit, Spann filed a Form 1045, Application for Tentative Refund, dated April 13, 1983, in which he carried portions of the credit back to 1979 and 1980, and claimed refunds for the years in the amounts of $5,825 and $2,175, respectively.

On his 1983 Federal income tax return, Spann reported gross income from his videotapes in the amount of $75, and a net loss in the amount of $37,873. Among the deductions claimed with respect to such videotapes were advertising expense (based upon Spann's second distribution agreement) in the amount of $37,800 and depreciation in the amount of $75, using the income forecast method of depreciation. Spann also claimed an investment credit on his 1983 return in the amount of $8,000, of which $1,908 was used in 1983 and the balance of $6,092 was carried back to 1980.

### Notices of Deficiency

In the notices of deficiency, respondent disallowed all losses and credits claimed by petitioners on their Federal income tax returns with respect to the videotape program. Respondent's disallowances in such notices are based, inter alia, upon his determination that the Vitagram videotape program lacks economic substance.

OPINION

The primary issue for decision is whether and to what extent petitioners are entitled to deductions and credits based upon their Vitagram videotape program investments. Respondent's primary position is that the transactions in issue lack economic substance consonant with their intended tax effects and should, therefore, be disregarded for Federal income tax purposes. Respondent asserts that the Vitagram videotape program constitutes a "generic tax shelter" and should, therefore, be analyzed under the objective test for economic substance recently set forth by the Court in *Rose v. Commissioner*, 88 T.C. 386, 408-415 (1987). Petitioners, of course, contend that the transactions in issue have economic substance, that they were entered into and carried out with the objective of making a profit, and that such transactions should, therefore, be accorded full effect for Federal income tax purposes. Based upon this record we agree with respondent.

In *Rose v. Commissioner, supra* at 412, we articulated certain characteristics generally shared by generic tax shelters, such as:

(1) tax benefits were the focus of promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance. * * *

In such cases tax motivation is apparent, and the focus of our inquiry is whether sufficient business purpose existed for the taxpayer to obtain the claimed tax benefits. *Rose v. Commissioner, supra* at 412. In determining a taxpayer's business purpose with respect to a generic tax shelter, we apply an objective test which incorporates factors found to be relevant in cases decided under section 183, as well as concepts underlying the statutes which provide for the claimed deductions (sections 162 and 167) and credits (sections 38 and 48) disputed herein. *Rose v. Commissioner, supra* at 414, 415.

Petitioners' activities with respect to the Vitagram video-tape program clearly constitute a generic tax shelter since the program's promotion focused on tax benefits; petitioners accepted the terms of purchase without price negotiation; the videotapes acquired were impossible to value when purchased and were created at relatively small costs; and the bulk of the consideration was deferred in the form of valueless promises to pay. Accordingly, we will apply the *Rose* test to determine whether petitioners' investment in such program lacks economic substance and should be disregarded for tax purposes. In making our determination, we will focus in the instant cases upon petitioners' activities both prior to and following their investment in the program, the relationship between the sales prices and the fair market value of the assets acquired, and the structure of the financing of petitioners' investment.

## Petitioners' Activities

Based upon the record before us, it is clear that petitioners engaged in the program primarily, if not solely, for the tax benefits it was designed to create. Petitioners had no experience in the television videotape-production industry. Despite their lack of experience, they made no independent investigation of the program and based their decisions to invest in the program solely upon the representations made to them by the promoters of the videotape program. Although petitioner Hurlbut visited the Superior studios on a routine trip to north Hollywood, it is clear that his investigation of Vitagram, Teledent, and Consulmac was limited to the promoters' representations.

No negotiations took place between the parties with respect to the transactions in issue. The amounts of petitioners' agreements with Vitagram and Teledent were determined solely with reference to the tax benefits petitioners desired. Likewise, the downpayments recited in such agreements were determined in accordance with the tax benefits and refunds to be generated by petitioners' investment in the program.

At the time petitioners entered into the purchase agreements, they had no idea how many videotapes they were to receive pursuant to such agreements, nor were they aware

of what artists would appear on their videotapes or what would be the content of such videotapes. Petitioners made no attempts to ascertain whether Vitagram and Teledent were performing in accordance with the agreements, even though the statements petitioners received from Consulmac reflected only de minimis amounts of income with respect to their videotapes. Petitioners did not know at the time of trial whether their videotapes had ever been on commercial television or otherwise marketed on their behalf. Under the circumstances, it is clear that petitioners were not concerned about the substance of their investments. Accordingly, we can only conclude that petitioners invested in the program primarily, if not exclusively, to obtain tax deductions and credits.

*Relationship Between Sales Price and Fair Market Value*

The prices petitioners agreed to pay for their videotapes bore no relationship whatsoever to the fair market value of what they received from Vitagram under the purchase agreements. Vitagram provided petitioners with as many videotapes as Laree arbitrarily decided would fulfill Vitagram's commitments for the agreed-upon tax benefits. The record is clear that petitioners did not bargain at arm's-length for the videotapes as suggested by the purchase agreements executed by petitioners. This is evidenced by the fact that the services performed by Vitagram in fulfilling its obligations were not invoiced with respect to any individual videotape. Thus, petitioners Clayden and Spann were unable to ascertain what they paid for any given videotape. Moreover, Clayden and Spann made no individual attempt to determine the prices they paid for any of their videotapes, nor did they seek to determine by independent appraisal the value of what they had purchased. Although Hurlbut knew what he paid for his videotape since he received only one videotape, he, too, made no attempt to determine its actual value. It is, therefore, abundantly clear on this record that petitioners were not concerned with either the price or the value of their videotapes.

*The Financing*

Petitioners' payments on their obligations to Vitagram and Teledent on their investment were less than the tax benefits they claimed. The payments petitioners made are minimal when compared with petitioners' total obligations to Vitagram and Teledent. No interest payments were ever made on such obligations. Although petitioners were all in default on the promissory notes and contractual obligations at the time of trial, Vitagram and Teledent had made no attempt to collect the amounts due. Based upon the entire record, we find that petitioners will never pay such amounts.

Based upon the foregoing, we hold that petitioners' investment in the Vitagram videotape program is devoid of economic substance and is to be disregarded for income tax purposes. Accordingly, petitioners are not entitled to any deductions or credits claimed in connection with such program. *Rose v. Commissioner*, 88 T.C. 386 (1987); *Patin v. Commissioner*, 88 T.C. 1086 (1987).

*Additional Interest*

As set forth above, respondent determined that petitioners are subject to the interest rate under section 6621(c), which provides for an increased rate of interest with respect to any "substantial underpayment" (in excess of $1,000) resulting from one or more "tax motivated transactions." Sec. 6621(c)(2). Among the transactions enumerated in the statute as "tax motivated" is "any sham or fraudulent transaction." Sec. 6621(c)(3)(A)(v).

Since we have held in the instant cases that the transactions in issue lack economic substance, and are therefore economic shams, section 6621(c) is applicable to the extent the underpayments resulted from such transactions. See *Cherin v. Commissioner*, 89 T.C. 986 (1987); *Patin v. Commissioner, supra* at 1129. We add that, in our view, the objective facts we have cited to show that the transactions lacked economic substance also demonstrate the absence of a good-faith profit objective. It is obvious that the purchase agreements were not entered into by petitioners for the purpose of acquiring videotapes for use in commercial

television or for any other business use. The videotapes were acquired to be used solely as props to obscure the nature of the actual transactions which was to obtain substantial tax benefits. Since petitioners' motives for entering into the transactions were not to acquire a profit-seeking activity, they had no profit objective. Accordingly, the additional interest may also be sustained on this ground. Sec. 301.6621-2T, A-4, Temp. Proced. & Admin. Regs., 49 Fed. Reg. 59394 (Dec. 28, 1984).

Respondent also determined additions to tax against petitioners Clayden under section 6651(a)(1) for failure to timely file income tax returns, and additions to tax with respect to all petitioners under section 6653(a)(1) and (2) for negligence or intentional disregard of respondent's rules and regulations. Petitioners bear the burden of proof with respect to such determination. Rule 142(a); see *Abramo v. Commissioner*, 78 T.C. 154, 162-164 (1982); *Bixby v. Commissioner*, 58 T.C. 757, 791 (1972). Petitioners have offered no explanation for their actions which gave rise to such additions to tax, and the record reflects no reasonable cause for such actions other than a saving of income taxes. Accordingly, we sustain respondent's determinations with respect to such additions to tax.

Finally, respondent determined additions to tax under section 6659 in the case of petitioners Spann, and additions to tax under section 6661 in the cases of petitioners Clayden and Spann. Section 6659 provides for an addition to tax with respect to underpayments attributable to a "valuation overstatement." Sec. 6659(a). A "valuation overstatement" exists where the value of or the adjusted basis of any property claimed on any return is 150 percent or more of its correct value or adjusted basis, as the case may be. Sec. 6659. In the instant case, petitioners Spann claimed investment credits based upon videotapes which they reported as having a combined adjusted basis in the amount of $240,000, which was the total amount of Spann's purchase agreements with Vitagram. Since we have held that the notes and contractual obligation in issue lacked economic substance, it is clear that the Spanns' correct adjusted basis in such videotapes is zero. *Rose v. Commissioner*, 88 T.C. 386, 426 (1987); *Zirker v. Commissioner*, 87

T.C. 970, 979 (1986). Accordingly, respondent is sustained on this issue.

Section 6661 provides for an addition to tax with respect to any underpayment attributable to "substantial under-statement" (exceeding 10 percent of the tax required to be shown on the return or $5,000, whichever is greater) of income tax. Sec. 6661(a) and (b). In the instant cases, petitioners Clayden and Spann showed zero tax liability on their income tax returns for the years in which respondent determined additions pursuant to section 6661. In each case, there were substantial underpayments of tax within the meaning of section 6661 for the years involved. No reduction in the understatement under section 6661(b)(2)(C) is appropriate in these cases. Accordingly, respondent is sustained on this issue.

> *Decisions will be entered for the respondent in docket Nos. 28767-85, 35680-85, and 41090-85.*
>
> *An appropriate order will be issued in docket No. 38135-85.*