FRANCIS J. RYBAK AND JOYCE A. RYBAK, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3544-85, 11104-85, 11105-85, 14308-85, 17033-85, 17034-85, 19775-85, 22868-85, 22869-85, 22905-85, 22909-85, 24968-85, 24994-85, 25009-85, 25015-85, 25025-85, 25040-85, 25054-85, 25062-85, 38662-85, 45776-85, 1792-86, 3759-86, 7882-86, 8838-86, 14094-86, 22292-86, 24301-86, 24683-86, 29693-86, 40665-86.

Filed September 7, 1988.

---

[1]Appendix A sets forth petitioners in these consolidated cases by docket number, name, and residence at the time their petitions were filed.

*John M. Moore,* for the petitioners.
*Robert J. Kastl* and *James D. Hill,* for the respondent.

OPINION

GOFFE, *Judge:* These consolidated cases were assigned to Special Trial Judge Marvin F. Peterson pursuant to section 7456(d)[2] (redesignated as section 7443A(b) by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1556, 100 Stat. 2755), and Rules 180, 181, and 183.[3] The Court agrees with and adopts his opinion which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

PETERSON, *Special Trial Judge:* These consolidated cases were selected by counsel and approved by the Court to serve as test cases for resolving issues common to a group of approximately 500 petitioners who invested in several programs marketed by Structured Shelters, Inc. Appendix B lists the docket numbers, petitioners, tax years involved, deficiencies, additions to tax, and increased interest determined for each year.

The issues for decision are (1) whether and to what extent petitioners are entitled to deductions and credits with respect to their investments in various master recordings; (2) whether and to what extent petitioners are entitled to deductions and credits with respect to their investments in Cocoa, Ltd.; (3) whether and to what extent petitioners are entitled to deductions and credits with respect to their investments in Preservation Research, Ltd., 1981; (4) whether and to what extent petitioners are entitled to deductions and credits with respect to their investments in Comprehensive Computer; (5) whether and to what extent petitioners are entitled to deductions and credits with respect to their investments in Lortin Leasing; (6) whether and to what extent petitioners are entitled to deductions

---

[2]All section references are to the Internal Revenue Code of 1954 as amended, unless otherwise indicated.
[3]All Rule references are to the Tax Court Rules of Practice and Procedure.

and credits with respect to their activities as chartered representatives of SSI; (7) whether petitioners are liable for additions to tax under sections 6653(a) and 6659; and (8) whether petitioners are liable for additional interest pursuant to section 6621(c).[4]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact and exhibits attached thereto are incorporated herein by this reference.

In 1979, Robert Iles, Sr. (Iles), began organizing Structured Shelters, Inc. (SSI), with the intent of using SSI to provide a nationwide tax investment planning system. Clients were solicited to use a financial analysis system created by SSI and to invest in various tax-advantaged investments. SSI contacted investors and also used sales agents, called chartered representatives, to market its products. Chartered representatives are persons or entities which obtained the right to represent SSI in a specific geographic area. The fundamental goal of chartered representatives was to enroll clients in the SSI system.

Once enrolled in the SSI system, each client created an investment company as a sole proprietorship. Next, the investment company executed a declaration of trust, naming SSI as trustee. SSI was given absolute and exclusive power and authority to manage trust property and conduct the trust's affairs, without the consent of the beneficiaries, so long as the trustee and an agent concurred. The purpose of the trust was to allow SSI to acquire properties for the client. SSI believed that the trusts would protect the beneficiaries from personal liability with respect to any specific investment and "prove to the IRS and the SEC that the Buyer has retained a qualified offeree representative."

SSI and its clients also executed management agreements which provided that the client would pay commissions in the amount of 1 percent of his adjusted gross income on a quarterly basis, and 10 percent of the cash proceeds received from any SSI recommended investment. The client was also required to timely submit all necessary information

---

[4]Some of these issues were raised by respondent in his answer or by amended answer.

to update the client's financial statement on a quarterly basis. All of the commissions were payable to SSI in Cincinnati, Ohio. SSI promised, inter alia, to search out and recommend investments and defend any action by the Internal Revenue Service in the Tax Court at SSI's expense.

The first product provided for new clients was a "random report." A random report is a statement of the client's financial condition and is the result of a computer analysis of certain financial and personal data provided by the client. The raw data was entered into the chartered representatives' computer and transmitted to the SSI mainframe computer. SSI's program analyzed the data and issued the report which calculated a budget and suggested various tax-advantaged investments. The cost for the initial Random Report was $155. Clients were required to update their reports quarterly at a cost of $20 per update.

During 1981, SSI marketed the free enterprise trust investment program which consisted of a package of four investments. Three of those four investments (the Children's Classics Series (Master Recording), Preservation Research and Development (Preservation Research), and the Nitrol Container (Lortin Leasing)) are at issue in this action, as well as several other programs that were marketed by SSI.

For convenience, our remaining findings of fact and opinion will be combined and grouped according to the programs to which they relate.

MASTER RECORDING

FINDINGS OF FACT

*General Background*

In the music industry, the term "master recording" refers to the original recording of a performance. These performances are usually recorded on tape. To mass market a master recording, the original recording is transferred to a "lacquer," by which grooves are cut into an acetate disc. The lacquer goes through an electroplating process in which it is sprayed with silver and dipped in nickel, and a different metal component called a "mother" is peeled off.[5]

---

[5]The term "metal parts" was used interchangeably with the term "mother" during the trial.

The mother undergoes an additional electroplating process which results in the creation of a mold, called a "stamper." Disc records are made by injecting a compound into the mold.

## Obtaining the Masters

On October 19, 1981, SSI and Western Educational Systems Technology (WEST) entered into an agreement whereby SSI, on behalf of its investors, agreed to purchase 50 master recordings for $6,250,000. WEST agreed to produce the masters within 40 days after SSI made a $125,000 downpayment. The balance of the purchase price consisted of SSI's assigning a receivable in the amount of $170,000 to WEST and the further assignment of notes that were to be given to SSI by its investors in the recordings. However, soon after the contract was executed, the parties agreed to substitute Oxford Productions (Oxford) for SSI.

On October 29, 1981, WEST and Oxford executed a master purchase and security agreement whereby Oxford purchased the masters at issue for a total price of $454,120 per master. The terms included a downpayment of $7,000 in cash, and Oxford signed a purported recourse note in the amount of $447,120. Monthly note payments, from the proceeds, were to begin on January 1, 1982. The first 3 years of payments would be considered payments of principal, with interest to be computed on the unpaid principal balance at the end of the third year. The stated purchase price of each master, after a reduction for imputed interest on the deferred payments, was $250,000. Hal Landers and Phyllis Kapp, brother and sister, executed the agreement on behalf of WEST and Oxford, respectively.

On October 28, 1981, SSI and Oxford agreed that SSI would serve as Oxford's leasing agent for the masters. SSI would receive 20 percent of the proceeds from any lease generated by SSI as Oxford's agent. On October 29, 1981, Oxford agreed to lease the 50 masters to SSI for $400,000 and provide SSI with two copies of each master prior to November 15, 1981. SSI agreed to release the masters prior to December 31, 1981. Oxford acknowledged the receipt of $295,000, which consisted of a $125,000 check and the aforementioned $170,000 receivable. The balance of

$105,000 due on the lease was paid by the use of a note which was due June 30, 1982, or when funds were collected. In exchange for acting as the leasing agent SSI retained $100,000 of the $125,000 payment.

*Production of the Masters*

The master recordings at issue were produced for WEST by Lewis Merenstein Productions (Merenstein). To receive payment, Merenstein submitted invoices for work that had been performed. In the earliest invoice, dated "as of November 31, 1981," Merenstein billed WEST $1,685.50 each, for three album tapes and metal parts. None of the three invoices is for work performed on any of the masters at issue herein. The invoice indicates that the three were "plated" in November of 1981. The next invoice is dated "as of May 31, 1982," and consists of a bill for 51 album tapes and metal parts at $1685.50 each. Twenty-four of these titles have an "S" designation, which indicates that those masters were produced for SSI.

During 1982, George Shea (Shea) wrote scripts for approximately 90 children's recordings, including a number of the recordings at issue herein. Usually, Shea was provided with a title for the script and he wrote stories based on those titles. Shea received approximately $60 to $70 per script, and he gave up his rights to the scripts. Because the pay was so low, Shea did not spend a great deal of time or effort on these products and believes that they are generally of poor quality. Shea indicated that payment for a high quality script, for instance, one published in a children's magazine, could range from $200 to $300. Additionally, between May 1982 and December 1982 Shea recorded stories for approximately 50 to 100 recordings and was paid $15 per hour.

*The Program*

There was no private placement memorandum or prospectus for this investment. A skeletal description of the program is included in the Free Enterprise Trust syllabus. According to the syllabus, during 1970, $67 million worth of children's recordings were sold. SSI claimed to have 3,000 titles available in 1981 and indicated that its products could

equal 20 percent of the children's market. SSI further claimed that the Master Recording program would be income-producing by 1982. Additionally, SSI encouraged its clients to lease masters instead of purchasing them. SSI noted that leasing avoided both the "at risk" rules of the Internal Revenue Code and problems obtaining a $240,000 loan. All petitioners leased their interests in the masters from Oxford.

Clients of SSI could lease a whole master or they could lease a partial interest in a master. Clients who leased a portion of a master were grouped into joint ventures with other investors until a whole master was leased. Clients did not choose their co-investors and generally did not care who ended up in their venture.

Generally, SSI, and not the investors, chose the particular master. Although some clients were asked to choose three titles that they were interested in, these clients were not always assigned an interest in one of their three choices.[6] Other investors did not indicate any title preference. Some of these clients did not believe that it was important to invest in any particular master, while others chose to rely on SSI. In some instances, SSI left the selection of the title for the investors to its supplier of the masters.

Nearly all of the petitioners relied solely on the representations of SSI when entering into this investment. None sought independent appraisals of their master. Some investors were provided with an appraisal rendered by Buggs Bowers for the "Wizard of Oz" master which indicated that the value of that master was $250,000, equaling the value claimed by SSI for every master. However, the "Wizard of Oz" master is not one of those before the Court.

Each lease was dated December 1, 1981, and was normally executed by Monica Iles on behalf of the lessees. Rent in the amount of $10,000 was prepaid, with $6,500 allocated to the first year and $500 allocated for each of the 7 subsequent years. Additionally, the lessees agreed to pay Oxford an amount equal to 25 percent of the "gross revenues" earned by the master during the term of the

---

[6]There is no evidence that any clients refused to participate because they did not receive an interest in the master that they chose.

lease. Oxford passed the investment tax credit of $25,000 per master through to the lessees.

*Marketing*

SSI arranged for Aim Record Distribution, Inc. (AIM), to distribute the records on behalf of the lessees. Each lessee executed an 18-month employment agreement whereby AIM agreed to produce an initial run of records (up to 2,500 45-rpm, 2,500 33 or 45-rpm EPs, and 1,250 33-rpm LPs) and market them on behalf of the lessee. The lessees agreed to pay AIM $2,500, plus 10 percent of any gross receipts, and also agreed to reimburse AIM for its costs from the proceeds of any sales.

AIM indicated that 50 percent of the $2,500 payment could be allocated to pressing costs, 15 percent to jackets, and 35 percent to other miscellaneous costs. However, SSI was permitted to retain $500 of each $2,500 payment as a commission. At first, the investors were not aware that SSI was retaining this commission. Subsequently, in August 1982, the agreement was amended with the cost to investors reduced to $2,000.

AIM's primary method of marketing the records was rack-jobbing. Rack-jobbing is a process whereby racks of approximately 144 records or tapes are placed in a retail outlet on a consignment basis. Typical outlets are convenience stores, drugstores, and department stores. The rack-jobber places the merchandise in the stores and is responsible for stocking and maintaining the rack.

A second marketing company, MPA Associates Inc. (MPA), contacted AIM during 1983. MPA realized that AIM's programs were not generating enough sales to create a significant return. Further, MPA was aware that the Internal Revenue Service was challenging the investments in the masters as lacking economic substance. MPA devised its own sales plan under which the lessees entered into a cooperative advertising program with the products marketed jointly. This program included television advertisements with toll-free numbers to generate impulse buying, development of a membership record club (American Family Entertainment), and exploration of the "premium market." The total cost of the MPA plan was $7,500, which included a

downpayment of $1,500 and execution of a 5-year note for the balance due.

A third company, Marketing Complex, Inc., was also used to market the records. In addition to continuing the MPA programs, Marketing Complex, Inc., entered the premium market. The premium market refers to sales of records at wholesale prices to companies that will give away the record in conjunction with the purchase of that company's product. For instance, a cereal company may give a "free" record to a consumer who has five proof of purchase coupons cut from cereal boxes. The premium is used to entice consumers to purchase more cereal than they might ordinarily purchase or to encourage brand loyalty. It is difficult to succeed as a provider of premiums. Generally, the premium distributors prefer popular products as premiums. Additionally, they demand products of high quality, and may seek to modify a particular premium product to suit their needs.

The average investor in the Master Recording program has received less than $100 of net income from record sales. Petitioners claim to have sold approximately 700,000 records to MPA during 1983.

*Artwork Sales*

By far, the most significant "sales" with respect to the masters came from the sale of goodwill and cassette rights to the masters. In essence, the lessees sold the right to reproduce the artwork on the covers of their masters for $100,000. The purchase price consisted of a $10,000 cash payment and either a new $90,000 promissory note or assumption of the original lessee's note. Often, the artwork was sold to an intermediary who would transfer these rights to another party who was purchasing the cassette version of the Master Recording program for $103,000. The $3,000 difference in price was the amount the intermediary received as a commission.

The artwork on each record is not unique; in fact, the same artwork was used on a number of different Master Recording records. The only visual method of differentiating these similar record covers is by title. Investors in the Master Recording program did not choose the artwork for their masters, as they rarely knew what artwork they

"owned" until they viewed the finished product sometime after they invested. Some investors were aware that the artwork on their records was also used on other SSI records.

*Valuation of the Master Recordings*

There are three general categories of children's recordings. The first two are called celebrity and character recordings and account for approximately 90 percent of the sales in the industry. A celebrity recording has a well-known artist performing on the record. Character recordings involve familiar stories of well-known characters such as the Care Bears, Strawberry Shortcake, Bambi, and Snow White. Sometimes, celebrities and characters are used on the same product. The remaining 10 percent of the market consists of generic products. Most generic stories have no characters in them. Other generic stories use well-known characters, however, the characters play unfamiliar roles (e.g., Snow White with the Care Bears) and, therefore, do not qualify as character recordings.

The recordings in issue are generic recordings. There are no celebrities participating in the recordings, so they are not celebrity recordings. Further, they do not qualify as character recordings because any recognizable characters are not playing their traditional roles.

Quality recording companies do not release different records with the same artwork as SSI has done. To do so only serves to confuse children and parents because they have trouble remembering whether they already own the record. Because most children who use these records are between ages 3 and 7, they have limited reading skills and are not able to distinguish among different products when the artwork is the same with only the title, different. Most marketing directed at children uses pictures of familiar characters in different settings. This strategy enables a child to identify the characters on the record while high-lighting that the record is distinct from other products. Additionally, it is contrary to industry practice to write stories to fit previously purchased artwork and titles.

The market for children's recordings has evolved from sales of 12-inch LP records to sales of cassettes. Further, descriptive books are commonly included with the audio

material. These books are provided to enhance sales, since they are designed to stimulate a child's learning experience. For the premium market, cassettes are used since they are less costly than LP records and are more popular.

An examination of a sampling of the records shows that they suffer from several defects. The packaging does not reach the normal standards in the children's recording business. None of the record covers describes the contents of the package, the album titles are nondescriptive and in some cases misleading, and the cover art rarely has any relationship to the story. The artwork used detracts from any value that the product may have, and undermines the potential sales to consumers, retailers, and middlemen.[7]

The production of the records is substandard. Often, one actor was used to portray a number of characters, instead of a different actor's being used in each role. Further, the records lack orchestration and sound effects. The records are clearly substandard to the records sold in both the premium and the retail markets, and it is unlikely that these records are viable in the premium market.

Because of the poor quality of the master recordings, it is highly unlikely that there would ever be a market for the records, and, in no event, would any record sell more than 5,000 units at a unit price of no more than $1. Based on such sales, the fair market value of each master recording at the time of purchase was, at most, $5,000.

## OPINION

The primary issue for decision is whether, and to what extent, petitioners are entitled to deductions and credits based upon their investment in the Master Recording program during 1981.[8] Respondent argues that the transactions in issue lack economic substance consonant with their intended tax effects and should, therefore, be disregarded for Federal income tax purposes. Respondent asserts that the Master Recording program is a "generic tax shelter"

---

[7]We note that these packaging methods have less of a detrimental effect in the premium market because premium records are not competing for the same sales as retail children's records. Therefore, it is common to put less cost and effort into the packaging of premium records.

[8]The relevant issues are identical for those petitioners who invested during 1982, and we see no need to discuss them separately.

and should be analyzed under the objective test for economic substance set forth by the Court in *Rose v. Commissioner,* 88 T.C. 386 (1987), currently on appeal. Petitioners contend that the transactions in issue have economic substance, that they were entered into and carried out with an objective of making a profit, and that these transactions should, therefore, be accorded full effect for Federal income tax purposes.

Petitioners argue that we should not follow the framework set forth in *Rose v. Commissioner, supra.* Petitioners claim that the *Rose* analysis emphasizes form over substance because the criteria employed in a *Rose* analysis are manipulatable. Further, petitioners argue that the Court is limited to addressing issues presented in the notice of deficiency "regardless of any new arguments or thoughts that the Respondent may have developed since the notice of deficiency." Apparently, petitioners contend that we may not use the *Rose* framework because the deductions and credits were not challenged or tried under such framework. We disagree with both of petitioners' assertions.

First, the *Rose* analysis incorporates the objective factors used in relevant cases decided under section 183, as well as concepts underlying sections 38, 162, 167, and 212. *Rose v. Commissioner, supra* at 414, 415.[9] Reliance on these objective factors enables us to focus our scrutiny on the actual mechanics of the transactions, rather than on an ephemeral analysis of subjective intentions. Second, the factors used in *Rose* are essentially the same as those used in other theories where respondent challenges the nature of the transactions. In this instance, petitioners were aware that respondent was challenging the transactions as "economic shams" and are not disadvantaged by our use of a coherent scheme of analysis. Accordingly, we will follow the framework set forth in *Rose.*

First, we must examine the transaction to determine whether tax motivation is apparent. If we find that tax motivation is apparent, we will then examine the transaction to determine whether a sufficient business purpose

---

[9] In any event, our conclusion would not change if we used the traditional analysis under these sections, rather than the framework provided by *Rose v. Commissioner,* 88 T.C. 386 (1987).

existed for the taxpayer to obtain the claimed benefits. *Patin v. Commissioner,* 88 T.C. 1086, 1116 (1987), currently on appeal. In *Rose v. Commissioner, supra* at 412, we articulated certain characteristics generally shared in generic tax shelters, such as:

(1) Tax benefits were the focus of promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance. * * *

Our review of the facts involved here leads us to conclude that tax benefits were focused on in the Master Recording program. We realize that there was no prospectus for this particular investment and that the limited materials available claimed that a profit would be realized. However, the investors must have been aware that they would receive an investment credit for the first year equal to or double their required cash payment. Further, a fundamental purpose of SSI was to provide tax-advantaged investments to its clients.

Next, all investors executed similar contracts without negotiation; the rights to masters are difficult to value in the abstract, and the value of the tangible property involved was insignificant; and, the masters were created at a small cost shortly before (or after) the transactions in question. Although petitioners paid 65 percent of the cash portion of their rent in advance, an undefined portion was deferred and would only be paid from sales revenues. Additionally, we note that 98 percent of Oxford's consideration to purchase the masters was deferred by a note which was to be paid from the proceeds. In light of these circumstances, we find that the Master Recording program was a generic tax shelter.

We now turn to a determination of whether petitioners' investment in this program lacks economic substance and should be disregarded for Federal income tax purposes. In this regard, we focus upon the lack of arm's-length dealings, petitioners' investment activities, and the relationship be-

tween the fair market value and the price of the masters. See *Patin v. Commissioner, supra* at 1117-1124; *Rose v. Commissioner, supra* at 415-422.[10]

## 1. *Lack of Arm's-Length Dealings*

The absence of arm's-length negotiations is a key indicator that a transaction lacks economic substance. *Rose v. Commissioner, supra* at 416; *Helba v. Commissioner,* 87 T.C. 983, 1005-1007 (1986). No negotiations took place between petitioners and SSI concerning the cost of the leases, and each master was arbitrarily valued at $250,000. We find no support for petitioners' claim that the $250,000 value is based upon negotiations between Iles and third parties. Iles originally agreed to purchase 50 masters from WEST for $125,000 each. However, 10 days later, Oxford was substituted as the purchaser, and the price rose to $250,000 per master. We find no evidence to indicate that the value of the masters doubled during those 10 days and conclude that this transaction was designed to artificially inflate the value of the masters. In sum, the record indicates a complete lack of arm's-length dealings between Iles and the investors and little distance between Iles, WEST, and Oxford.

## 2. *Petitioners' Investment Activities*

Petitioners did not investigate the Master Recording program prior to engaging in the venture. Petitioners did not obtain independent appraisals of their masters, nor did they attempt to view their masters prior to their purchase. In fact, most investors did not even know which particular master they had leased until they saw the paperwork.

After the program began, investors did little more than call SSI to inquire why there was not greater success. Although it is true that SSI engaged MPA to pursue alternate marketing programs, we note that the initial overture came from MPA, after it learned that the Internal Revenue Service was questioning the legitimacy of the program. In this instance, we do not believe that the

---

[10]In this case petitioners incurred no long-term indebtedness, nor do petitioners argue that they were covered by perceived congressional intent. Accordingly, those factors are not discussed.

alternative marketing arrangements were spurred by a continuing interest in making a profit but, rather, were undertaken only in an effort to protect the tax benefits already claimed.

### 3. *Relationship Between Fair Market Value and Price*

First, petitioners claim that our decision in *Faulkner v. Commissioner*, 88 T.C. 623 (1987), precludes respondent from challenging the value of the masters. Petitioners argue that the value they claim is derivative of the value assigned by the purchaser Oxford, and that, therefore, respondent must first challenge Oxford. Petitioners misread *Faulkner*. In *Faulkner*, we concluded that, if a lessor satisfies the requirements of sections 46 to 50, the lessee need not independently meet those requirements in order to qualify for an investment tax credit. The value of the property was not at issue in *Faulkner*, and we certainly did not hold that taxpayers need not prove they are entitled to the amount of credit they claim. We find nothing in *Faulkner* which relieves petitioners of their burden of proving that respondent's determination is in error. See *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a).

Second, we find that the price of $250,000 per master bears no relation to the fair market value of the recordings. We note that the quick sale to Oxford inflated the claimed value of each master from $125,000 to $250,000. However, there is no evidence of any circumstances existing during that short interval which had an impact on their value. Further, we find no credible evidence that the masters were even worth $125,000 each.

Petitioners contend they sold 700,000 records to MPA during 1983. However, with the exception of Iles' testimony, to which we give no weight, the only evidence in the record to substantiate this sale is a purchase order which fails to identify any particular records and specifies that no records should be shipped without further written instructions. We find that there is no credible evidence that an actual transfer of 700,000 records ever occurred.

Mr. Sheldon L. Tirk (Tirk), who testified as an expert witness, is the executive vice president of marketing and sales for Kid's Stuff, the second largest children's record

and cassette company in the United States. Tirk has been employed by Kid's Stuff for approximately 10 years and is in charge of all of the company's sales, marketing, merchandising, and product release. Tirk has 30 years of experience marketing audio products. He owned a group of retail record and tape stores, was a part owner of Piks, Inc., a distributor of children's records and cassettes, and he served as the head of the children's record division of Mercury Records for approximately 3 years. Tirk is an expert in the audio recording industry, particularly the children's recording industry.

At trial, petitioners offered into evidence two appraisals from Ken Lauber as well as the "Wizard of Oz" appraisal by Buggs Bowers. All of the appraisals suggested a $250,000 value for each of the masters. However, we note that the appraisals were admitted into evidence for a limited purpose. The Buggs Bowers appraisal was admitted into evidence only to show that Iles relied on it when "negotiating" a purchase price for the masters. Ken Lauber's appraisals were admitted only to show that the lessees may have relied on the appraisals when deciding whether or not to invest in the program. These appraisals are not evidence of the value of any of the masters at issue herein.

Respondent submitted appraisals by Mr. Thomas Bonetti (Bonetti) for 29 of the master recordings.[11] Bonetti also separated the children's market into three classifications. The first classification is the "celebrity market," which is primarily a combination of the celebrity and character markets as described by Tirk. Celebrity products account for approximately 90 percent of the children's recording market. The remainder consists of traditional nursery tales (other than those which are in the celebrity category), and original stories. Most of the scripts for the masters herein are original stories; however, some of the scripts are based on nursery tales.

Bonetti used the potential stream of income approach to value the recordings. Bonetti considered the methods available for delivering a particular recording to the consumer

---

[11]The Court recognized Bonetti as an expert witness. He has approximately 30 years of marketing experience in the recording industry. His credentials include experience in sales and sales management, serving as the head of Mercury Records prerecorded tape division and extensive involvement with sales of intangible record rights.

and analyzed the cost effectiveness of those methods. Further, he considered the quality of the scripts, production, and packaging. Bonetti also synthesized information he obtained from other people in the recording industry when making his appraisals.

The most convincing evidence of value was provided by Bonetti. We find his appraisals, in conjunction with Tirk's testimony concerning the children's record market, to be entirely credible and persuasive. We concur with Bonetti's opinion that, in all respects, the records were of poor quality. We disagree with petitioners' suggestion that Bonetti disregarded the premium market, and also with their apparent contention that the poor quality of the recordings would serve them well in the premium market.

Additionally, we give no credence to Iles' claim that 21 million units of premiums would be sold during 1987. Petitioners' prior lack of success in marketing the masters carries greater weight than Iles' projection.

Based upon the foregoing analysis, we hold that petitioners' investments in the Master Recording program are devoid of economic substance and were entered into solely for the income tax benefits. On this basis, the investments are to be disregarded for Federal income tax purposes. Accordingly, petitioners are not entitled to any deductions or credits claimed in connection with such program.

## COCOA, LTD.

### FINDINGS OF FACT

*General Background*

In 1981, SSI offered Cocoa, Ltd., which was organized to research and develop a method for producing cocoa in a more efficient and uniform manner. Traditionally, cocoa is produced by the "batch" method. Manuel L. Chalin (Chalin) had invented, and patented, a method for continuously producing alkalized cocoa. Continuous production is a more desirable method because it can result in savings in labor costs as well as production of a more uniform final cocoa product. In addition to using Chalin's method, Cocoa, Ltd. was to research and develop a computerized order entry

system (hereinafter sometimes referred to as system), which would analyze the color of each batch of ingredients during various stages of processing and adjust certain variables to ensure the consistency of the final product. Computerization of the quality control would enable cocoa to be processed without having a chemist present.

Chalin and Iles had previously attempted to produce cocoa pursuant to Chalin's method. The first program did not include the use of a computerized order entry system. This first program also began during 1980, when Chalin transferred the U.S. rights to at least 96 percent of the patents to five "Cocoa Trusts," of which Iles was the trustee. On July 15, 1980, Chalin assigned his interest in the two patents to the trusts for cash, a promissory note, and an accompanying security agreement. Each trust also executed a note of a lesser amount to Chalin as well as a note in favor of Continental Dutch Cocoa (Continental), a company organized to process cocoa pursuant to the Chalin patent method.[12]

Due to problems which arose between Continental, Chalin, and the Cocoa Trusts, the venture was abandoned without ever marketing any cocoa. In December 1980, Chalin and Iles agreed to continue working together. The second venture was called Cocoa, Ltd., and included a computerized order entry system.

Through Iles, the Cocoa Trust beneficiaries sold their interests in the patents to Foodtech.[13] By purchase agreements dated December 15, 1981, Foodtech agreed to make a cash downpayment and assume the Cocoa Trusts' promis-

---

[12]

| Trust | Interest purchased | Cash paid | Chalin note-1 | Chalin note-2 | Continental note |
|-------|-------|-------|-------|-------|-------|
| I | 16% | $7,500/ [1]30,000 | $163,000 | $15,000 | $52,500 |
| II | 20 | 37,500 | 817,500 | 18,750 | 62,625 |
| III | 20 | 37,500 | 817,500 | 18,750 | 62,625 |
| IV | 28 | 7,500 | [2]1,146,250 | 26,250 | 91,875 |
| V | 12 | 22,500 | 491,250 | 11,250 | 39,750 |
| Total | [3]96 | 112,500/ 135,000 | 3,435,500 | 90,000 | 309,375 |

[1]There is a duplicate page in the purchase agreement which indicates that a 20-percent interest would be transferred for $7,500 cash and a note in the amount of $163,000.
[2]The purchase agreement indicates that the amount of the note should have been $163,500.
[3]Iles claims that he invested in a Cocoa Trust VI which purchased a 4-percent interest.

[13]Foodtech is also described by SSI as the agent for the buyers, who were Cocoa, Ltd.

sory notes in exchange for the assignment of the beneficiaries' interests in the patents. By April 1982, the patents had been assigned to Foodtech. SSI received $130,000 commission from this transaction.

*The Program*

Cocoa, Ltd., was sold in units. Forty-seven units of participation were to be sold to a maximum of 20 purchasers at a price of $150,000 per unit. Only SSI clients were eligible to purchase units. The placement memoranda indicate that the per-unit price would consist of cash payments in the amount of $31,595.74 ($28,404.25 in 1981 and $3,191.49 in 1982) and a recourse promissory note in the amount of $118,404.26. The note was to be paid, first from 75 percent of the gross sales proceeds, and, presumably, then by the maker of the note. Although the term of the note was 5 years, it could be extended for an additional 5 years and the private placement memorandum, dated July 1981, indicates that any unpaid balance would not be due for 10 years.

According to the placement memorandum, Cocoa, Ltd., would "perform R & D leading to the development of COCOA PROCESSING. The Purchaser will acquire the rights to the information generated by the R & D. The Purchaser will have the right and responsibility to market and exploit the information on his own behalf." It was anticipated that Cocoa, Ltd., would contract with a number of "independent individuals" to perform various aspects of the research and development.

A copy of a July 11, 1980, valuation of the patents was included with the memorandum. The valuation was rendered for Chalin by PATENT VALUATION ASSOCIATES. The appraisal uses the income-approach method to determine the value of the patents. This method involved determining the present value of anticipated returns over 11 years and 7 months, the remaining life of the patents. The valuation was based upon anticipated production and sales of "dutched" cocoa in the following rounded amounts:

| Year(s) | Amount |
|---|---|
| 1981 | 1 million pounds |
| 1982 | 13 million pounds |

| Year(s) | Amount |
|---|---|
| 1983 | 25 million pounds |
| 1984 | 35 million pounds |
| 1985-1991 | 42.8 million pounds/yr. |
| 1992 | 5 million pounds |

It was assumed that the patents would be exploited through a license or lease with a royalty in the amount of $0.046 per pound. A 15-percent rate of return was used to discount the anticipated proceeds to reflect their present value. Using these figures, PATENT VALUATION ASSOCIATES determined that the present value of the patents was $4,471,261.80.

The memoranda also highlights the anticipated tax benefits of the transaction. These benefits included a projected tax writeoff for 1981 (the initial year) in the amount of $148,936.17 per unit. The memoranda highlighted that the writeoff was approximately 500 percent of the initial cash payment and stated that the deal was "structured in order to provide a *4.77 to one write off of cash invested.*"

Investors executed PURCHASE ORDER DEPOSIT RECEIPTS (PODRs) to participate in Cocoa, Ltd. The PODRs indicated that the investor's investment company was contracting with Frank J. Normali (Normali) and that Normali would produce research and development which would lead to a method for "computerized food processing and an assignable food patent." Purchasers made a downpayment of about 20 percent and agreed to pay 10-percent interest on the balance due. Additionally, the purchaser assigned royalties of $0.01 per pound of food processed "for life or until the balance of the contract was paid." There is no due date on the PODRs.

Whole units and fractional increments of units were sold to investors. By January 31, 1982, 31.05 units had been sold and a total amount of $879,783.16 had been received. On February 16, 1982, $120,000 of these proceeds was paid to SSI as a partial disbursement of commissions, and on April 15, 1982, $739,280 was paid to "FOOD TECH." Petitioners assert that the purpose of the $739,280 check was to enable Foodtech to begin research and development. However, during May 1982, Foodtech paid $609,219.40 to Iles, various individual trusts, and to several Cocoa Trusts.

Petitioners utilized the accrual method of accounting and, for their 1981 tax year, claimed deductions for "research and development." Additionally, petitioners typically claimed credits under section 44F for increasing research activities. The deductions and credits were calculated based upon the sum of petitioners' cash payments and their long-term indebtedness.

In its summary of investments for 1983, SSI indicated that Foodtech had been paid to complete a computer chip which would protect the processing formula of the patent. However, Foodtech never produced a chip. In a letter to Cocoa, Ltd., investors dated March 31, 1988, Iles indicated that the hardware configurations for the computer system had been designed and that Robert Iles Computer Service (RICS), a company in which Iles claimed to own 90 percent of the stock, was working on an order entry system for the processes which could be written within 12 months. Iles was "confident that you will have your full system ready to make delivery to you by April of 1984." Attached to the letter were an Assignment of Patents and a Bill of Sale. Neither of these documents is dated. Iles, as trustee of Cocoa Trusts, assigned the trusts' interests in the patents to Cocoa, Ltd., in consideration of a partial payment of $4,317.31, pursuant to "that certain purchase agreement executed in late 1981."

OPINION

The primary issue for decision is whether, and to what extent, petitioners are entitled to deductions and credits based upon their investment in Cocoa, Ltd. Respondent, again, argues that the transactions in issue lack economic substance and should, therefore, be disregarded for Federal income tax purposes. Respondent asserts that Cocoa, Ltd., is a "generic tax shelter" and should be analyzed under the objective test for economic substance set forth by the Court in *Rose v. Commissioner,* 88 T.C. 386 (1987). Petitioners, of course, contend that the transactions in issue have economic substance, that they were entered into and carried out with an objective of making a profit, and that these transactions should be respected for Federal income tax purposes. We will examine the program using the frame-

work set out in *Rose* to determine whether petitioners are entitled to their claimed deductions and credits.

Our first step is to determine whether tax motivation is apparent in the transaction. If so, the transaction is a "generic shelter" and we must determine whether a sufficient business purpose existed for the taxpayers to obtain the claimed benefits. *Patin v. Commissioner,* 88 T.C. 1086, 1116 (1987). In *Rose v. Commissioner, supra* at 412, we articulated certain characteristics generally shared by generic tax shelters, such as:

(1) Tax benefits were the focus of promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance.  * * *

This transaction clearly reflects apparent tax motivation since the offering memoranda repeatedly emphasize the tax benefits, including a first year tax writeoff greater than four times the amount of cash invested. Furthermore, all investors executed contracts without price negotiation. Additionally, the right to market any information generated by the research and development is inherently difficult to value, and only insignificant tangible property was involved. Finally, as discussed below, the bulk of the consideration was deferred in the form of promissory notes which were nonrecourse in substance. For the foregoing reasons we conclude that Cocoa, Ltd., was a generic tax shelter.

Accordingly, we must determine whether petitioners' investments in this program lack economic substance and should be disregarded for Federal income tax purposes. In making our determination, we will focus upon the lack of arm's-length dealings, petitioners' investment activities, the structure of the financing, and the relationship between fair market value and price. See *Patin v. Commissioner, supra* at 1117-1124; *Rose v. Commissioner, supra* at 415-422.

### 1. *Lack of Arm's-Length Dealings*

First, the fact that all petitioners received the same package of rights for the same price indicates that there were no negotiations concerning price between the petitioners and Cocoa, Ltd. Second, we find instructive the fact that Iles played a number of roles in this venture. Iles claims a personal interest in one of the Cocoa Trusts and acted as the trustee for all of the Cocoa Trusts, the entities that sold the patents. Further, Iles managed Cocoa, Ltd., the purchaser of the patents. Additionally, Iles also created SSI which solicited the investors in Cocoa, Ltd. With this knowledge, we are not surprised to find that SSI received $120,000 from the sale of Cocoa, Ltd., units, nor are we surprised by Iles' receipt of $60,000 from the transfer of the patents from Cocoa Trusts through Foodtech to the Cocoa, Ltd., investors. Finally, we note that Iles has, at times, claimed ownership of 90 percent of the shares of RICS,[14] the "independent individual" finally engaged to perform research on the computer chip. In these circumstances we find there was a lack of arm's-length dealings.

### 2. *Petitioners' Investment Activities*

There is no evidence that petitioners investigated Cocoa, Ltd., prior to investing, nor have we seen evidence of any substantial activity since they invested. Petitioners chose to play a passive role and depend on their chartered representatives to protect their interests.

### 3. *The Structure of the Financing*

The presence of deferred debt that is in substance or in fact not likely to be paid is an indication of lack of economic substance or an exaggeration thereof. *Knetsch v. United States*, 364 U.S. 361 (1960); *Rose v. Commissioner*, *supra* at 419; *Waddell v. Commissioner*, 86 T.C. 848 (1986), affd. 841 F.2d 264 (9th Cir. 1988). We will examine the substance, not the form, of such debt. *Waddell v. Commissioner, supra.*

---

[14]At trial Isles claimed that he was not the true owner of the stock, but that he held the stock for others.

Approximately 80 percent of the purchase price was deferred. This debt was evidenced by the PODRs. Although the placement memorandum indicates that the term of the debt was either 5 or 10 years, no term is stated on the PODRs. Additionally, there is no indication that the debt was recourse; in fact, the PODRs indicate that the debt was to be paid from the proceeds of the venture. In these circumstances, we do not believe that the investors ever intended to pay the indebtedness, except by the royalty exacted if the venture succeeded.

Further, petitioners' cash outlays were insignificant because they were offset by a greater amount of tax benefits claimed in the first year.

### 4. *Relationship Between Fair Market Value and Price*

The private placement memorandum contains a valuation of the patents which supports petitioners' claimed value and lends credence to the offering price. However, incorporated into the valuation was an assumption that revenues would begin to be realized in 1981, and an acknowledgment that the patents would expire after 1992. However, no cocoa was marketed during 1981. Since petitioners did not consummate their investments before the end of 1981, they should have been aware that the forecast was not reliable. Further, had petitioners investigated the status of the program at that time, questions should have been raised concerning Cocoa, Ltd.'s capacity to produce cocoa in the near future. Although Normali was supposed to perform research and development for Cocoa, Ltd., he testified that he had been interested in working on the Cocoa, Ltd., project but ended up doing nothing more than sending a résumé to Isles. However, Normali also indicated that after learning that SSI was using his name, he did not discuss the matter with Iles even though he was working with SSI in other capacities. We note the discrepancy but do not find it necessary to determine whether or not Normali actually worked on Cocoa Ltd. Consequently, we find that petitioners had little chance of realizing the amounts claimed in the appraisal.

Although Iles testified that the computer order entry system was complete, petitioners failed to introduce any documentary evidence of the system. Further, Iles admitted

that the chemical analysis portion of the system was not complete by the time of trial. Under these circumstances, we find that SSI failed to develop a viable computerized order entry system. Additionally, we find no evidence that the computer order entry system has other applications apart from cocoa processing. Therefore, the value of the computerized order entry system is intertwined with the marketability of the patents, and the fair market value of the investments is considerably less than the amount claimed by petitioners. Accordingly, the price petitioners paid bears no relation to the fair market value of the investments.

Based upon the foregoing, we hold that petitioners' investments in Cocoa, Ltd., have no economic substance and are to be disregarded for Federal income tax purposes. Accordingly, petitioners are not entitled to any deductions or credits claimed in connection with such program. *Rose v. Commissioner, supra; Patin v. Commissioner, supra.*

PRESERVATION RESEARCH

FINDINGS OF FACT

*General Background*

In 1981, SSI offered "Preservation Research, Ltd. 1981" (Preservation Research) as part of the Free Enterprise Trust. Preservation Research was a limited partnership, to be formed under the laws of Nevada, consisting of Kent Maerki (Maerki) as the general partner and the Free Enterprise Trust as the sole limited partner.

Upon formation, the partnership intended to enter into a contract with FoodSource, Inc. (FoodSource), paying FoodSource to "conduct research and development upon technology and equipment to be used in the preservation of perishable agricultural products." The partnership would receive royalties from FoodSource's marketing of any vehicles and containers that were developed.

On October 20, 1981, Iles, as trustee of the Free Enterprise Trust, executed the LIMITED PARTNERSHIP AGREEMENT for Preservation Research. That same day, Maerki, as general partner of Preservation Research, exe-

cuted a promissory note to FoodSource in the amount of $83,333,333.33. The term of the note was 7 years and it bore interest at 9 percent. The note could be extended by mutual agreement. Additionally, the note recited "This is a recourse note and the maker hereof is personally liable for the payment of sums due or accruing hereunder." The note was secured by a security agreement. Further, on October 20, 1981, Iles, as trustee, executed a subscription agreement whereby the Free Enterprise Trust purchased a research and development contract and assumed Preservation Research's liability on the note.

On or about November 3, 1981, Preservation Research entered into an agreement with FoodSource entitled "RE-SEARCH AND DEVELOPMENT CONTRACT COUPLED WITH LI-CENSE AGREEMENT AND SECURITY AGREEMENT." In that agreement Preservation Research, as licensor, agreed to pay FoodSource $100 million to "design, test and document improved technology for the transportation of perishable agricultural products" and obtain patents in Preservation Research's name. Of the total price, $16,666,666.67 was payable upon execution, and a renewable 7-year promissory note, with interest at 9 percent, was to be executed for the $83,333,333.33 balance due.

FoodSource received an exclusive license to market the results of the research and development. Beginning on April 1, 1983, FoodSource was to pay Preservation Research a royalty in the amount of $10,000 for each of the first 12,500 vehicles put into operation by FoodSource and $1,000 for each vehicle thereafter, until $265,000,000 had been paid. Additionally, FoodSource agreed to provide Preservation Research with progress reports at least semi-annually.

*The Program*

Preservation Research was highlighted in the Free Enterprise Trust brochure. The brochure stated that taxpayers using the accrual method of accounting would receive a 6-to-1 writeoff (the total price of one investment unit was $133,333.33, and $22,222.22 of that amount was a cash payment) for an investment in Preservation Research. Additionally, the brochure stated that there would also be a tax credit available when there was income from the

investment. The brochure mentioned that the tax credit might have to be recaptured if the research were unsuccessful. Investors were not required to purchase a whole investment unit. SSI projected that Preservation Research would produce $66,463 of taxable income by the end of 1986. However, the basis for this projection was not provided.

On or near the last day of the taxable year 1981, investors, through their investment companies, executed "PURCHASE ORDER DEPOSIT RECEIPTS" in which Preservation Research, as contractor, agreed to "produce for the [investor] Research and Development for preservation of agricultural perishable products." In the PURCHASE ORDER DEPOSIT RECEIPTS, the buyers assigned to Preservation Research "100 percent of each dollar of revenues generated by the marketing efforts (results) of the Research and Development referred to in this agreement." Investors made their downpayments and agreed to pay at least 10-percent interest on the balance due. The PURCHASE ORDER DEPOSIT RECEIPTS do not indicate when payment on the remaining balance was to be made.

Typically, investors in Preservation Research claimed deductions for the 1981 tax year equal to the total price of their research and development contracts as reflected in their PURCHASE ORDER DEPOSIT RECEIPTS. Additionally, the investors also claimed a credit for research and development in 1981 which was based on the total price of their contracts.

On September 11, 1982, Maerki wrote Iles concerning Preservation Research. Maerki indicated that there were 268 individual PURCHASE ORDER DEPOSIT RECEIPTS, representing an equal number of contracts for research and development. Additionally, Maerki noted that $645,789.50 had been collected. Of that amount, $96,868.42 was due diligence fees, leaving $548,921.08 of checks from the Free Enterprise Trust. Of the $548,921.08, $32,289.46 was designated as General Partner fees (5 percent of the gross amount collected), leaving $516,631.62, which Maerki purportedly sent to FoodSource (Research Contractor). Finally, Maerki indicated that he was not concerned about the lack of required progress reports because he believed that it was

typical for little to happen during the first 6 to 12 months of a research project.

No income or significant change in financial condition was reported on the Partnership Return of Income forms filed by Preservation Research for the 1982, 1983, and 1984 tax years. Preservation Research did not file a certificate of limited partnership in Nevada until December 1982. On March 19, 1984, FoodSource filed a petition for Bankruptcy under chapter 11.

Investors who testified at trial knew little about their investments. They had little comprehension of its purpose or progress and had received no money. Essentially, these people invested because SSI recommended that they do so, and they relied on SSI to manage their investments. Based on this record, the investments had little or no value when the investments were made.

OPINION

We must determine whether petitioners are entitled to deductions and credits based upon their investments in Preservation Research. We will examine the transactions pursuant to the criteria suggested in *Rose v. Commissioner*, 88 T.C. 386 (1987).

This investment is clearly a generic shelter. See *Rose v. Commissioner, supra* at 412. The tax benefits of the investment were highlighted in the Free Enterprise Trust syllabus. There was no negotiation concerning price, as evidenced by the fact that all investors received the same per-unit rates and terms. The rights to the research and development results, and the right to receive royalties from vehicles produced by FoodSource,[15] are difficult to value, and there were no tangible assets included in this offering. Finally, as discussed below, the debt was in the form of valueless promises to pay. Accordingly, we will use the *Rose* analysis to determine whether petitioners' investments in this program lack economic substance and should be disregarded for Federal income tax purposes.

---

[15]The trials and tribulations of FoodSource in securing and operating 1,000 containers including those known in 1981 are described in *Noonan v. Commissioner*, T.C. Memo. 1986-449.

To make our determination, we will focus upon the lack of arm's-length dealings, petitioners' investment activities, the structure of the financing, and the relationship between fair market value and price. See *Patin v. Commissioner, supra* at 1117-1124; *Rose v. Commissioner, supra* at 415-422.

## 1. *Lack of Arm's-Length Dealings*

Once again, there were no negotiations concerning price between petitioners and Preservation Research. Additionally, we find no evidence of any negotiations between the Free Enterprise Trust and FoodSource. Further, we note that progress reports were not provided as agreed, that Preservation Research did not file partnership papers in Nevada until well after the deal was consummated, and that Preservation Research has not pursued any claims it may have against FoodSource in FoodSource's bankruptcy proceeding. These failures to conform with common business practices strongly indicate a lack of arm's-length dealings. Simply put, Preservation Research was not operated in a manner which would have enabled it to take advantage of any opportunity to make a profit.

## 2. *Petitioners' Investment Activities*

Petitioners did not investigate the economic feasibility of this activity prior to investing, nor did they take any action after they invested which would have enhanced the likelihood of profit. The investors claimed their tax benefits and then sat back and waited to see what happened.

## 3. *The Structure of the Financing*

The note executed by Preservation Research contains language indicating that it was a recourse obligation. However, it is the policy of this Court to examine the substance, not the form, of such debt. *Waddell v. Commissioner,* 86 T.C. 848 (1986), affd. 841 F.2d 264 (9th Cir. 1988). In this instance, we find no evidence which indicates that Preservation Research had the financial resources to pay the cash portion of its obligation (over $16 million), much less the $83,333,333.33 note. There is no evidence that a sufficient number of investors would subscribe to cover the

obligation, and we are not aware of any assets held by Preservation Research which would have helped meet this obligation. Realistically, the only source of funds for payment of the obligation were the proceeds generated by the venture. Further, we are convinced by the testimony of the petitioners that they had no knowledge about the extent of their "personal" indebtedness and had no intention of paying off their indebtedness from any source other than the royalties they were to receive. We conclude that the financing served solely to inflate the tax benefits.

### 4. *The Relationship Between Fair Market Value and Price*

Petitioners failed to prove a fair market value anywhere near the purchase price of $100 million. The indebtedness was clearly nonrecourse, if not fictional, and we find the price to be so overstated that it has no relation to the value. We can see no basis for assuming that FoodSource would provide research and development worth $100 million.

For the reasons outlined above, we hold that petitioners' investments in Preservation Research are devoid of economic substance and are to be disregarded for Federal income tax purposes. Therefore, petitioners are not entitled to any deductions or credits with respect to this activity. *Rose v. Commissioner, supra; Patin v. Commissioner, supra.*

COMPREHENSIVE COMPUTER

FINDINGS OF FACT

*General Background*

In 1980, SSI offered an investment program called "Comprehensive Computer Systems 1980" (Comprehensive Computer). Purchasers of the program were tenant(s)-in-common to a research and development contract with a purpose of researching and developing software for an advanced payroll accounting and management system suitable for installation and use in any computer environment. The system would be distinct from most others because it would provide management with an advanced program for handling payroll from timecards. It would be capable of writing

checks on a predetermined schedule or on demand, automatically registering all amounts and instantly complying with the filing requirements of all governmental agencies as they apply to payroll. A separate program was to be developed for each State, thus enabling the programs to take into account the different rates and methods of taxation used by various States.

Further, this software system would include a personnel management component. This would allow the operator to enter a name into the system and match the talents of that person to the tasks to be performed. Finally, the system would keep track of an individual's employment history with the company.

### The Program

Comprehensive Computer was offered by Comprehensive I Trust (the trust), an entity organized by Iles and of which he served as trustee. The private placement memorandum (memorandum) of the trust indicated that Iles would manage the program and hire any necessary subcontractors. The memorandum also indicated that the trust would perform the research and development for the payroll software system. However, these duties were subsequently subcontracted to RICS, which apparently developed the initial program.

The offering memorandum indicated that investors could profit both from tax benefits and from a "royalty opportunity." These royalties consisted of a 10-percent interest in any income received by Comprehensive Computer. However, 75 percent of that amount was to be applied to a "nonrecourse" note[16] that investors would execute in favor of the trust, leaving 25 percent of the 10-percent royalty for the investors.

The offering memorandum contained a variety of claims about the tax effects of investing in the program. Investors were told they would receive a 100-percent return of investment cash via tax benefits. Additionally, the memorandum indicated that investors using the accrual method of accounting could, in 1980, write off 1,000 percent of the initial cash payment, a claim repeated later in the memoran-

---

[16]The prior page of the memorandum indicated that the note would be recourse.

dum. A discussion of Federal tax matters occupies 10 pages of the memorandum and is followed by a 24-page tax opinion which was drafted by R. Iles Tax Consultants, Inc.

Since the Comprehensive Computer program contemplated a separate software system for each State, investors purchased the rights to the software system for a particular State. The programs were sold on a "first-come first-served" basis. The price for the various systems was based solely upon the amount that the investor could afford to pay. Iles raised approximately $100,000 from investors for this venture.

Investors executed three documents to participate in the program. First, under a "BID PURCHASE AGREEMENT," the investor agreed to purchase an interest in various computer programs to be developed by RICS. RICS was to develop and field test the system. Ten percent of the purchase price was to be paid in cash, and the balance was to be invoiced to the investors upon completion.[17] RICS reserved the right to charge 10-percent interest on the unpaid balance of the invoice upon completion. Next, investors entered into an "EXCLUSIVE LICENSE AGREEMENT" which provided that RICS would pay investors 10 percent of any money generated from the use of the investor's properties during the term of the purchase agreement. Finally, pursuant to a document entitled "ASSIGNMENT OF PROCEEDS," the investors agreed to pay 75 cents of each dollar received to RICS, until the balance due was paid off.

Iles indicated that a software system was completed during 1983 or early 1984. However, the investors have received little or no income from their investment in Comprehensive Computer. Investors who participated in Comprehensive Computer relied on their SSI representative in making the investment and continue to rely on SSI for the success of the venture.

## OPINION

We will examine this program, using the criteria set forth in *Rose v. Commissioner,* 88 T.C. 386 (1987), to determine

---

[17]SSI had determined that it would not be necessary to execute a "full recourse promissory note" to evidence the indebtedness.

whether petitioners are entitled to deductions and credits based upon their investments in Comprehensive Computer.

We find that tax motivation is apparent and this investment is a generic shelter. See *Rose v. Commissioner, supra* at 412. The private placement memorandum highlights a 1,000-percent writeoff of cash invested, as well as a 100-percent return of cash invested via tax benefits. There were no negotiations regarding price based upon any fair market value, as shown by the fact that investors could purchase their interests for whatever price they wished to pay. The right to market information not yet developed is difficult to value and we see no evidence that any tangible assets were included in the offering. Finally, as discussed below, the debt was in the form of valueless promises to pay.

Accordingly, we must determine whether petitioners' investments in this program lack economic substance and should be disregarded for Federal income tax purposes. In making our determination, we will focus upon lack of arm's-length dealings, petitioners' investment activities, and the relationship between fair market value and price. See *Patin v. Commissioner, supra* at 1117-1124; *Rose v. Commissioner, supra* at 415-422.

### 1. *Lack of Arm's-Length Dealings*

First, we note that there were no price negotiations between petitioners and Comprehensive Trust I. Although investors received different interests at different prices, Iles admits that the final prices were based upon how much the investor could pay. Additionally, Iles managed SSI, acted as broker of the offering, was responsible for the tax opinion letter in the offering materials, and employed a company which he controlled, if not owned, to conduct the research and development. Essentially, Iles created the investment, sold it to his clients based upon his evaluation of the tax benefits, and hired his own company to do the work. We find little evidence that this activity was conducted at arm's length.

### 2. *Petitioners' Investment Activities*

Petitioners invested in this activity without having investigated its potential, solely upon the recommendation of SSI.

Further, after investing, petitioners did nothing to protect their investments other than question Iles or their chartered representatives.

### 3. *Structure of the Financing*

The private placement memorandum indicated that investors would sign a recourse promissory note. However, this plan was changed, and investors merely contributed 10 percent of their total investment amount in cash and waited to receive invoices for the remaining balance due. Once again, it was anticipated that payment would come from the royalties to be received, should a product ever be marketed. In view of the fact that the product to be marketed had not yet been designed, such a financing arrangement has no concrete basis and is clearly meaningless. These circumstances convince us that the petitioners had no intention of creating an enforceable obligation, nor did they have an intention of paying their "obligations" except from the proceeds of any revenues their investments generated. Accordingly, we hold that the financing does nothing more than inflate the amount of tax benefits claimed by investors.

### 4. *Relationship Between Fair Market Value and Price*

We find there to be no relationship between fair market value and the price. Investors were allowed to pay whatever amount they wished, although each package of rights was essentially the same. This indicates that the "value" of these rights was equal to the amount that investors wished to pay for the tax benefits they received and bore no relationship to any economic value. Further, we give no weight to Iles' claim that four purchasers sold programs for $100,000. We do not accept Iles' self-serving testimony as proof that such sales occurred. Much more persuasive to us is the fact that no other investors received any significant return on their investments. This fact, coupled with petitioners' failure to place in evidence proof of their system, convinces this Court that no commercially viable system was ever developed.

Pursuant to the above discussion, we hold that petitioners' investments in Comprehensive Computers are devoid of

economic substance and are to be disregarded for Federal income tax purposes. Accordingly, petitioners are not entitled to any deductions or credits based upon their participation in this program.

LORTIN LEASING

FINDINGS OF FACT

*General Background*

This Free Enterprise Trust offering involved leasing nitrol-injected storage containers. Lortin Leasing Corp. (Lortin) was created by Iles to purchase nitrol containers and lease them to clients of SSI. Injecting nitrol into marine storage containers would enable perishable products to be shipped without aging during transport. Leasing, instead of purchasing, the containers would enable SSI clients to participate in the program without incurring the indebtedness of purchasing the containers. Initially, Iles intended to control Lortin. However, upon advice of counsel, Iles decided that Lortin would be managed by someone outside of SSI. Mr. Robert Norwood (Norwood) eventually became the president and sole shareholder of Lortin.

The containers were to be manufactured by Budd Co. (Budd) and sold to FoodSource. In turn, FoodSource would sell the containers to Lortin. Lortin made a $45,000 downpayment for each container with the remaining amount to come from rental proceeds as Lortin leased the containers to SSI clients.

*The Program*

Investors participating in this venture executed lease agreements dated December 1, 1981. The agreements provided for the lease of a shipping container from Lortin for a nonrenewable 7-year term. The total amount of payments under each lease was approximately $252,000. The lessees were supposed to make a downpayment of $55,000 which would be allocated to rent for the first 6 months and the last year. Thereafter, rent in the amount of $17,937 was due semiannually. Investors who did not lease a whole container were grouped into joint ventures with other participants.

The containers qualified for an investment tax credit, and Lortin elected to pass the credit through to the lessees. The credit was calculated on the basis that the useful life of the containers was 14 years and that each container had a fair market value of $260,000.

Participants also executed a "LICENSING JOINT VENTURE AGREEMENT" with FoodSource Management Co., Inc. (FoodSource Management). FoodSource Management became the "Managing Venturer" and was responsible for leasing the containers on behalf of the lessees. FoodSource Management was to use the container rental proceeds to pay Lortin on behalf of the lessees. FoodSource Management would receive 6 percent of the gross revenues as management costs, as well as 50 percent of any profits.

The parties stipulated into evidence certain Budd records, as well as a September 14, 1984, letter from the general manager of Budd to District Counsel. The letter indicated that the so-called nitrol containers that Budd manufactured were actually standard marine containers. The letter states, "Budd neither furnished nor installed any special equipment to make these 'nitrol' containers. Any such installation, if there was in fact installation of nitrol atmosphere control equipment, was made by FoodSource and/or its agents after the containers had been paid for and delivered by Budd."

There are 32 containers involved in this proceeding. With respect to each of these containers, FoodSource defaulted on its obligation to Budd, and Budd refused to release the containers to FoodSource during 1981. All of the containers were held by Budd until at least 1983 when all but two of the containers were transferred to Budd Leasing Corp., which is managing the containers on behalf of the investors and will continue to do so until Budd's interest in the containers is extinguished. The other two containers were sold to investors during 1984.

On July 31, 1982, Norwood wrote a letter to "Ms. Monica Isles [sic] - Manager, Joint Ventures." Norwood reported that the containers had generated revenues of $85,200; however, this figure was based on an unverified report from FoodSource. On September 10, 1982, Norwood wrote another letter to Monica Iles requesting that she notify the

lessees that, as of September 1, 1982, their leases were in default for nonpayment.

On December 30, 1982, Norwood wrote to Monica Iles informing her that the subject containers "are involved in litigation between FoodSource, Inc. and Budd Company [and] cannot be released for service." Norwood wrote that FoodSource had agreed to make funds available for the lessees to amend their tax returns and pay any interest and penalties as a result of the loss of the Investment Tax Credit for 1981. Apparently, FoodSource also agreed to provide new containers as they became available. However, these agreements were never completed.

On March 23, 1983, Norwood wrote a letter to Bob and Monica Iles informing them that, upon advice of counsel, he could not resume a business relationship with them or their companies. Further, he noted that they failed to respond to numerous requests to provide him with information to enable him to contact the lessees, and that those who had contacted him were not yet aware that their leases were in default.

## OPINION

We must determine whether petitioners are entitled to deductions and credits based upon their investments in Lortin Leasing. Respondent argues that the values of the containers and the dates they were placed in service are controlled by our decision in *Noonan v. Commissioner,* T.C. Memo. 1986-449. However, the parties did not agree to be bound by our decision in *Noonan* and we have no evidence that the containers in issue herein were those at issue in *Noonan.* Therefore, we will base our decision upon the evidence presented in this case.

Petitioners have the burden of proving that respondent's determination is in error. *Welch v. Helvering,* 290 U.S. 111 (1933); Rule 142(a). Petitioners offer little to support their deductions and credits. Their primary claim is that under *Faulkner v. Commissioner,* 88 T.C. 623 (1987), respondent may not challenge the valuation of the containers in the

hands of the lessees when respondent has not challenged the valuation by the lessor/purchaser. We disagree. See our discussion of this argument with respect to the Master Recording program, *supra.*

In order to claim depreciation deductions, and an investment tax credit, property must be placed in service by the taxpayer during the year for which the deductions and credits are claimed. Secs. 38(a), 46(a)(2), 46(c)(1); secs. 1.46-3(a)(1), 1.167(a)-10(b), 1.167(a)-11(e)(1)(i), Income Tax Regs. Property is placed in service when it is "placed in a condition or state of readiness and availability for a specifically assigned function." Secs. 1.46-3(d)(1)(ii) and 1.167(a) - 11(e)(1)(i), Income Tax Regs. See also *Piggly Wiggly Southern, Inc. v. Commissioner,* 84 T.C. 739, 745-746 (1985), affd. on another issue 803 F.2d 1572 (11th Cir. 1986).

The record clearly indicates that the containers were stored by Budd until 1983. There is no evidence that any of the containers were placed in service until they were turned over to Budd Leasing Corp. in 1983. Since the containers had not been released by Budd until 1983, we find that no revenues had been generated prior to 1983. Reports from FoodSource indicating that there had been leasing activity prior to 1983 are not supported by the record, and we disregard them.

Furthermore, we are not persuaded by petitioners' claim that they constructively received the containers during 1981. We are convinced that Budd held the containers to protect its financial interest and not as an agent of the ultimate lessees. Even were we to accept this "agency" claim, petitioners still failed to show that the containers were in a state of readiness and available to be used at any time prior to 1983. The record clearly indicates that the containers were not furnished with any nitrol equipment until after they were released by Budd. Therefore, we hold that petitioners have failed to prove that the containers were placed in service during 1981. Accordingly, petitioners are not entitled to deductions or credits based upon their investments in Lortin Leasing.

CHARTERED REPRESENTATIVES

FINDINGS OF FACT

## General Background

In 1981, SSI hired Shelter Bay Associates (SBA) to recruit chartered representatives, agreeing to pay a commission for each referral who became a chartered representative. SBA sent interested people to Cincinnati to meet with SSI representatives. Generally, the recruits were financial planners, accountants, or broker/dealers, i.e., persons with an existing client base who were involved with financial sales and planning.

In Cincinnati, the recruits attended a presentation by Iles and/or other representatives of SSI about the SSI system. The presentation lasted almost 1 day, and the potential representatives were invited back the next day for discussion. People who agreed to become chartered representatives were required to take a 5-day training course in Cincinnati.

Chartered representatives sold their clients the SSI programs and other investments based upon the results obtained in the random report. No more than 25 percent of the investments presented by chartered representatives could be from a source other than SSI. Chartered representatives received the following compensation:

—25 percent of the fee paid by a promoter to SSI
—$90 of the $155 cost of the initial random report
—90 percent of 1 percent of a client's "gross annual income"
—90 percent of 10 percent of any cash proceeds received by the client from any investment recommended by SSI

## The Program

There were two plans available for becoming a chartered representative. One plan required a total payment of approximately $33,000. This payment included $14,500 for a computer and operating software and $18,500 which was attributable to the SSI system. The SSI system consisted of computerized processes, management programs, standard operating procedures, specifications, and proprietary marks and information. Included in the $18,500 payment was the

use of the SSI financial planning software program which SSI claims was customized for use in particular States. The stated duration of the agreement was 1 year. However, language in the agreement indicates that the agreement would be "renewed annually on its anniversary date unless terminated by either party."[18]

A second plan provided that the financial planning software program for a particular State could be purchased by executing a promissory note in the amount of $152,000 in addition to the $33,000 payment. Purchase of the program entitled the chartered representative to modify the system, resell the program, or otherwise market the program in that State.

A sample promissory note submitted to the Court contains a provision allowing the maker of the note to extend the note for two 5-year periods at a cost of $2,000 per extension. Further, if the note expired unpaid, the payee of the note had "full recourse to the assets listed below: (a) equipment (b) software (c) client base as goodwill (d) any accounts receivable (e) future residual fees." Another document provided to chartered representatives stated that at the end of the note period SSI's options were limited to renegotiating the note or repossessing the items listed on the note.

The stated annual interest rate of the note was 10 percent. However, chartered representatives were also entitled to a yearly performance bonus of $15,200 (equal to the amount of interest due for 1 year), provided that the representative had no outstanding payables, including interest, due to the general office.

SSI stated that chartered representatives who purchased a software system could claim an investment tax credit of $18,500, since the value of the SSI system was $185,000. SSI also indicated that the first year depreciation deduction would pay the full cost of the recommended hardware ($14,500), assuming that the individual was in the 50-percent tax bracket.

---

[18]There is other language indicating that the chartered representatives had to provide written notice if they intended to renew.

OPINION

Respondent challenges two aspects of the chartered representative transactions. First, respondent claims that the $152,000 promissory notes executed by some petitioners are not bona fide and should be ignored for Federal income tax purposes. Second, respondent claims that petitioners are not entitled to deductions for that portion of the $33,000 payment in excess of the amount ($14,500) paid to purchase a computer and software. Petitioners have the burden of proving that respondent's determination is in error. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a).

Petitioners contend that the promissory notes are recourse notes and are evidence of genuine indebtedness. However, it is clear that the parties intended to limit SSI's recourse to the listed assets and that the chartered representatives did not intend to incur any personal liability.

Further, petitioners fail to convince the Court that they incurred any genuine debt. None of the executed promissory notes were placed in evidence. Petitioners did not make timely interest payments, and there is no persuasive evidence that any payments were made without an offsetting "performance bonus." Although the notes created in 1981 have matured, it was not shown that they have been properly extended or that SSI is attempting to collect on them. In one instance it was shown that the note has simply been suspended. The actions of SSI and the chartered representatives convince us that the parties did not treat the liability as genuine indebtedness, and we believe that the only purpose of the notes was to unreasonably inflate the amount of tax benefits. Accordingly, the $152,000 promissory notes will be disregarded for Federal income tax purposes.

Respondent next contends that petitioners' payment of $18,500 is solely attributable to the purchase of a right to represent SSI and receive commissions and that such payment is a capital expenditure which may not be depreciated or amortized because it has an indefinite useful life. Petitioners label the payment as a payment for the lease of computer software. Petitioners have the burden of establishing the reasonableness of their amortization deductions. *Welch v. Helvering, supra;* Rule 142(a).

Clearly, a number of rights and/or assets were transferred to petitioners in exchange for their $18,500 payment. Petitioners' claim that the total payment is allocable to the software lease is not reasonable, and we are unable to determine what portion of their payment is attributable to the software lease. Therefore, petitioners fail to satisfy their burden of proving that respondent's determination is in error. Accordingly, petitioners' deductions with respect to the $18,500 payments are denied.

## Additions to Tax

### Section 6653(a)

Respondent determined that petitioners are liable for additions to tax under section 6653(a)(1) and (a)(2). Section 6653(a)(1) imposes an addition to tax if any part of an underpayment of tax is due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) imposes an additional amount, but only with respect to the portion of the underpayment attributable to the negligence. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. *Neely v. Commissioner*, 85 T.C. 934, 947 (1985).

Petitioners argue that they were not negligent because they placed their reliance in the chartered representatives who were well qualified to analyze the investments. We disagree. Although the chartered representatives may have been qualified to analyze the investments, they held a financial stake in the shelters. The chartered representative agreement indicates that chartered representatives would receive 25 percent of the fee paid to SSI by the promoter and that that fee would "vary from 15 percent to 20 percent of the dollar volume collected." In these circumstances, petitioners did not rely on competent, independent parties; they did no more than inquire of the promoter if the investment was sound. Such reliance is not the type of activity which will overcome the addition to tax for negligence or intentional disregard of the rules and regulations. See *Patin v. Commissioner*, 88 T.C. 1086, 1130 (1987).

We further note that the investors did not investigate the projects on their own, nor did they obtain independent

appraisals for any of the investments. Under these circumstances, petitioners' actions were not reasonable and prudent, and we find that the additions to tax are proper. Accordingly, the additions to tax under section 6653(a) are sustained.

*Section 6659*

Respondent claims that additions to tax pursuant to section 6659 are appropriate with respect to the master recordings, container leases, and chartered representatives' $152,000 promissory notes.[19] Section 6659 imposes a graduated addition to tax whenever an individual has an underpayment of tax which equals or exceeds $1,000 and which is attributable to a valuation overstatement. A valuation overstatement occurs when "the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)." Sec. 6659(c).

In some of the cases, respondent asserted an addition to tax under section 6659 in his answer. In those instances, respondent bears the burden of proving that the addition to tax is appropriate. Sec. 6214(a); *Zirker v. Commissioner,* 87 T.C. 970, 978 (1986); Rule 142(a). Petitioners bear the burden of proving that the addition to tax pursuant to section 6659 is not applicable in all instances where respondent made his determination in the notice of deficiency. Rule 142(a). Petitioners did not address the addition to tax under section 6659 in either of their briefs and, therefore, are deemed to have conceded this issue. In all instances where petitioners bear the burden of proof, respondent's determination is hereby sustained. In those instances where respondent bears the burden of proof, we must determine whether an addition to tax is appropriate.

We found the master recording transactions to be devoid of economic substance and held that they are to be disregarded for Federal income tax purposes. Therefore, petitioners' correct adjusted basis in the master recordings

---

[19]Respondent asserted these additions to tax against many of the petitioners. However, on brief respondent's argument is limited to these three activities. Accordingly, we conclude that respondent has abandoned his claim under sec. 6659 with respect to the other transactions.

is zero. See *Rose v. Commissioner, supra* at 426; *Zirker v. Commissioner,* 87 T.C. 970 (1986). Accordingly, an addition to tax for valuation overstatement is appropriate in these instances.

We determined that the $152,000 promissory notes executed by the chartered representatives were not genuine and should be ignored for Federal income tax purposes. Accordingly, an addition to tax for valuation overstatement is appropriate with respect to these promissory notes.

We determined that petitioners were not entitled to deductions with respect to their Lortin Leasing investments. However, petitioners' underpayment of tax is due to the fact that their assets were not placed in service during 1981, not because they overstated the value of the containers. Therefore, an addition to tax for valuation overstatement is not appropriate. *Todd v. Commissioner,* 89 T.C. 912 (1987).

## Additional Interest

Section 6621(c) provides for an increased interest rate with respect to any "substantial underpayment" (greater than $1,000) in any taxable year "attributable to one or more tax motivated transactions." Sec. 6621(c)(1) and (2). The increased rate applies to interest accrued after December 31, 1984.

In some instances, respondent determined that additional interest was appropriate in his answer. In those instances, respondent bears the burden of proving that the increased interest rate is appropriate. Sec. 6214(a); *Zirker v. Commissioner,* 87 T.C. 970, 981 (1986); Rule 142(a). Petitioners bear the burden of proving that the increased interest rate is not applicable in those instances where respondent made his determination in the notice of deficiency. Rule 142(a). In their reply brief, petitioners made faint protest to the increased interest rate claiming that, "in the event that petitioners are found to have been involved in a trade or business * * * Section 6621(c) is not applicable." We find that petitioners have sufficiently raised the issue of whether section 6621(c) is applicable to that statement, and we will decide this issue based upon the merits of the parties positions instead of on the forcefulness of their arguments.

Tax-motivated transactions include any sham or fraudulent transaction. Sec. 6621(c)(3)(A)(v). We held that the investments in Master Recording, Cocoa, Ltd., Preservation Research, and Comprehensive Computer lacked economic substance and are, therefore, economic shams. Accordingly, section 6621(c) is applicable to the extent the underpayments resulted from such transactions. See *Cherin v. Commissioner,* 89 T.C. 986, 1000 (1987); *Patin v. Commissioner, supra* at 1129. We note that, in our view, the objective facts we have cited to show that the transactions lacked economic substance also demonstrate the absence of a good-faith profit objective. It is obvious that any rights or properties purchased were acquired as props to obscure the nature of the actual transactions which was to obtain substantial tax benefits. Since petitioners' motives for entering into the transactions were not to acquire a profit seeking activity, they had no profit objective. Accordingly, the additional interest is also sustained on this ground. *Clayden v. Commissioner,* 90 T.C. 656, 677 (1988); sec. 301.6621-2T, A-4, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 59394 (Dec. 28, 1984).

We disallowed petitioners' claims with respect to Lortin Leasing because we found that the property was not placed in service during 1981. As this activity does not fall within those activities described in either section 6621(c)(3)(A), or the regulations prescribed under section 6621(c)(3)(B), we find that the increased rate of interest is not applicable in these instances.

Petitioners failed to prove that the chartered representatives were entitled to deductions for the $18,500 payments. Our disallowance of the deductions for failure to meet the burden of proof does not support a finding that the transactions were tax-motivated transactions under section 6621(c). Accordingly, the increased rate of interest under section 6621(c) does not apply to underpayments of tax attributable to these transactions.

*Decisions will be entered under Rule 155.*

## APPENDIX A

| Docket No. | Petitioners | State |
|---|---|---|
| 3544-85 | Francis J. Rybak and Joyce A. Rybak | Iowa |
| 11104-85 | Robert Kehl and Violet Kehl | New York |
| 11105-85 | Donald T. Holland | New York |
| 14308-85 | Thomas J. Sacher and Nancy J. Sacher | New York |
| 17033-85 | Donald S. McCandless, Jr., and Mabel J. McCandless | Missouri |
| 17034-85 | Thomas Sacher and Judith Sacher | New York |
| 19775-85 | Curtis T. Colovos and Susan L. Colovos | California |
| 22868-85 | Bert W. Greib and Gertrude J. Greib | Washington |
| 22869-85 | Jimmie J. Jones and Thelma J. Jones | California |
| 22905-85 | Luther M. Flynn and Carol L. Flynn | California |
| 22909-85 | Stephen W. Garcelon and Carolyn J. Garcelon | California |
| 24968-85 | Frank Joesting, Jr., and Dierdre Davis Joesting | Maryland |
| 24994-85 | Lindley A. Ropp and Sharon K. Ropp | Missouri |
| 25009-85 | Richard C. Tish and Eleanor J. Tish | Illinois |
| 25015-85 | David L. Ferrill | Illinois |
| 25025-85 | Chris A. Ferrill and Nancy A. Ferrill | Illinois |
| 25040-85 | Oliver J. Reiss and Sally L. Reiss | Georgia |
| 25054-85 | Lawrence Teeman and Mildred Teeman | Illinois |
| 25062-85 | Dale Wayne Matteson and Patricia D. Matteson | California |
| 38662-85 | William D. Thomas and Deborah L. Thomas | Ohio |
| 45776-85 | Richard C. Tish and Eleanor J. Tish | Illinois |
| 1792-86 | William D. Thomas and Deborah L. Thomas | Ohio |
| 3759-86 | Richard W. Jaenke and Patricia A. Jaenke | Ohio |
| 7882-86 | Jimmie J. Jones and Thelma J. Jones | California |

| *Docket No.* | *Petitioners* | *State* |
|---|---|---|
| 8838-86 | George W. Stroemple and Maryruth Stroemple | Ohio |
| 14094-86 | Donald G. Wolfcale and Ruthie J. Wolfcale | Ohio |
| 22292-86 | Josiah E. Smith and Leah L. Smith | Kansas |
| 24301-86 | Robert M. Kehl and Violet H. Kehl | New York |
| 24683-86 | Curtis T. Colovos and Susan L. Colovos | California |
| 29693-86 | Donald T. Holland | New York |
| 40665-86 | Thomas A. Graham and Celeste F. Graham | Ohio |

Appendix B
is shown on
pp. 571-574.

APPENDIX B

| Docket No. | Petitioner | Taxable year | Deficiency | ADDITIONS TO THE TAX | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | I.R.C. sec. 6653(a) | I.R.C. sec. 6653(a)(1) | I.R.C. sec. 6653(a)(2)[1] | I.R.C. sec. 6659 | I.R.C. sec. 6621(c)[2] |
| 3544-85 | Francis J. Rybak and Joyce A. Rybak | 1978 | $3,465.00 | $173.25 | | | $1,039.50 | $3,770.00 |
| | | 1979 | 4,360.64 | 218.03 | | | 1,308.19 | |
| | | 1980 | 5,333.00 | 266.65 | | | 1,599.90 | |
| | | 1981 | 5,331.00 | | $266.55 | $5,331.00 | 1,550.40 | |
| 11104-85 | Robert Kehl and Violet Kehl | 1978 | 1,198.00 | | | | 359.00 | |
| | | 1979 | 1,188.00 | | | | 356.00 | |
| | | 1981 | 8,966.01 | | | | | |
| 1105-85 | Donald T. Holland | 1978 | 3,973.00 | | | | 1,192.00 | |
| | | 1979 | 5,111.00 | | | | 1,533.00 | |
| | | 1980 | 6,970.00 | | | | 2,091.00 | |
| | | 1981 | 7,676.00 | | | | 2,303.00 | |
| 4308-85 | Thomas J. Sacher and Nancy J. Sacher | 1982 | 389.00 | | | | 117.00 | |
| | | 1983 | 41.00 | | | | 12.00 | |
| 17033-85 | Donald S. McCandless, Jr., and Mabel J. McCandless | 1978 | 5,107.00 | 264.25 | | | 1,585.50 | |
| | | 1981 | 6,843.00 | | 342.15 | | | |
| | | 1982 | 1,222.00 | | 61.60 | 1,222.00 | | |
| 17034-85 | Thomas Sacher and Judith Sacher | 1981 | 5,183.00 | | | | | |
| | | 1982 | 729.00 | | | | | |
| 19775-85 | Curtis T. Colovos and Susan K. Colovos | 1981 | 3,770.00 | | 189.00 | 3,770.00 | 1,131.00 | |
| 22868-85 | Bert W. Grieb and Gertrude J. Grieb | 1978 | 13,801.00 | 690.00 | | | 4,140.00 | 13,801.00 |
| | | 1979 | 14,547.00 | 727.00 | | | 4,364.00 | 14,547.00 |
| | | 1980 | 45,223.00 | 2,261.00 | | | 13,567.00 | 45,223.00 |
| | | 1981 | 7,931.00 | | 397.00 | 7,931.00 | 2,379.00 | 7,931.00 |
| | | 1982 | 15,588.00 | | 779.00 | 15,588.00 | 4,676.00 | 15,588.00 |

Footnotes appear at end of Appendix.

APPENDIX B—continued

| Docket No. | Petitioner | Taxable year | Deficiency | ADDITIONS TO THE TAX | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | I.R.C. sec. 6653(a) | I.R.C. sec. 6653(a)(1) | I.R.C. sec. 6653(a)(2)[1] | I.R.C. sec. 6659 | I.R.C. sec. 6621(c)[2] |
| 22869-85 | Jimmie J. Jones and Thelma J. Jones | 1978 | $2,054.00 | $102.70 | | | $616.20 | $2,054.00 |
| | | 1981 | 9,620.00 | | $481.00 | $9,620.00 | 2,886.00 | 9,620.00 |
| 22905-85 | Luther M. Flynn and Carol L. Flynn | 1978 | 1,366.00 | 68.30 | | | 409.80 | 1,366.00 |
| | | 1981 | 14,229.00 | | 711.45 | 14,229.00 | 4,268.70 | 14,229.00 |
| 22909-85 | Stephen W. Garcelon and Carolyn J. Garcelon | 1981 | 5,436.00 | | 271.80 | 5,436.00 | 1,526.70 | 5,436.00 |
| 24968-85 | Frank Joesting, Jr. | 1978 | 1,447.00 | | | | 434.00 | 1,447.00 |
| | | 1979 | 849.00 | | | | | 849.00 |
| | Dierdre Davis Joesting | 1978 | 2,443.00 | | | | 733.00 | |
| | | 1979 | 230.00 | | | | | |
| | | 1980 | 509.00 | | | | | 509.00 |
| | Frank Joesting, Jr., Deirdre Davis Joesting | 1981 | 3,861.00 | | | | 1,151.00 | 3,861.00 |
| | | 1982 | 377.00 | | | | | 377.00 |
| 24994-85 | Lindley A. Ropp and Sharon K. Ropp | 1978 | 4,464.00 | 223.20 | | | 1,339.20 | 4,464.00 |
| | | 1979 | 6,193.00 | 309.00 | | | 1,857.90 | 6,193.00 |
| | | 1980 | 6,673.00 | 333.65 | | | | 6,673.00 |
| | | 1981 | 7,777.00 | | 388.65 | | 2,212.50 | 7,777.00 |
| 25009-85 | Richard C. Tish and Eleanor J. Tish | 1978 | 2,761.00 | 138.05 | | | 828.30 | 2,761.00 |
| | | 1979 | 2,811.00 | 140.55 | | | 843.30 | 2,811.00 |
| | | 1980 | 3,532.00 | 176.60 | | | 1,059.60 | |
| | | 1981 | 3,958.00 | | 197.90 | 3,764.00 | 1,129.20 | |
| 25015-85 | David L. Ferrill | 1978 | 2,443.00 | 122.15 | | | 732.10 | 2,443.00 |
| | | 1979 | 2,057.00 | 102.85 | | | 617.10 | 2,057.00 |
| | | 1980 | 3,498.00 | 174.90 | | | 1,049.40 | 3,498.00 |
| 25025-85 | Chris A. Ferrill and Nancy A. Ferrill | 1981 | 1,923.64 | | 96.18 | 1,923.64 | 550.99 | 1,923.64 |
| | | 1980 | 2,733.00 | 136.65 | | | 819.90 | 2,733.00 |
| | | 1981 | 1,380.88 | | 69.04 | 1,380.88 | 358.69 | 1,380.88 |

Footnotes appear at end of Appendix.

APPENDIX B—continued

|  |  |  |  | ADDITIONS TO THE TAX |  |  |  |  |
| Docket No. | Petitioner | Taxable year | Deficiency | I.R.C. sec. 6653(a) | I.R.C. sec. 6653(a)(1) | I.R.C. sec. 6653(a)(2) [1] | I.R.C. sec. 6659 | I.R.C. sec. 6621(c) [2] |
|---|---|---|---|---|---|---|---|---|
| 25040-85 | Oliver J. Reiss | 1978 | $5,576.00 | $278.80 |  | $5,576.00 | $1,672.80 | $5,576.00 |
|  | and Sally L. Reiss | 1981 | 28,576.00 |  | $1,405.40 | 28,108.02 | 8,227.20 | 27,424.00 |
| 25054-85 | Lawrence Teeman | 1978 | 5,859.00 |  |  |  | 1,758.00 | 5,859.00 |
|  | and Mildred Teeman | 1981 | 12,168.00 |  |  |  | 3,650.00 | 12,168.00 |
| 25062-85 | Dale Wayne Matteson | 1978 | 9,274.00 | 464.00 |  |  | 2,782.00 |  |
|  | and Patricia D. Matteson | 1979 | 263.00 | 13.00 |  |  |  |  |
| 38662-85 | William D. Thomas | 1981 | 11,170.00 |  | 559.00 | 11,170.00 | 3,351.00 | 11,170.00 |
|  | and Deborah L. Thomas | 1980 | 5,265.00 | 263.25 |  |  |  | 5,265.00 |
| 45776-85 | Richard C. Tish, Eleanor J. Tish | 1982 | 3,031.00 |  |  |  |  |  |
| 1792-86 | William D. Thomas | 1978 | 1,375.00 | 68.75 |  |  | 412.50 | 1,375.00 |
|  | and Deborah L. Thomas | 1979 | 963.00 | 48.15 |  |  |  |  |
|  |  | 1981 | 21,019.00 |  | 600.95 | 12,019.00 | 3,048.60 | 11,908.00 |
|  |  | 1982 | 948.00 |  | 47.40 | 948.00 |  |  |
| 3759-86 | Richard W. Jaenke | 1978 | 5,723.00 |  |  |  | 1,717.00 | 5,723.00 |
|  | and Patricia A. Jaenke | 1979 | 8,827.73 |  |  |  | 2,648.00 | 8,827.73 |
|  |  | 1980 | 5,041.00 | 252.00 |  |  | 1,512.00 | 5,041.00 |
|  |  | 1981 | 4,836.00 |  | 242.00 | 895.00 | 1,451.00 | 4,836.00 |
|  |  | 1982 | 1,486.00 |  |  |  | 414.00 | 1,381.00 |
|  |  | 1983 | 631.00 |  |  |  |  |  |
| 7882-86 | Jimmie J. Jones | 1979 | 5,875.00 | 293.75 |  |  | 1,762.50 | 5,875.00 |
|  | and Thelma J. Jones | 1980 | 2,156.00 | 107.80 |  | (3) | 646.80 | 2,156.00 |
| 8838-86 | George W. Stroemple | 1978 | 7,846.00 |  |  |  | 2,353.80 | 7,846.00 |
|  | and Maryruth Stroemple | 1979 | 3,644.00 |  |  |  | 1,093.20 | 3,644.00 |
|  |  | 1981 | 7,156.00 |  |  |  | 2,146.80 | 7,156.00 |
|  |  | 1982 | 1,423.00 |  |  |  |  | 1,411.00 |

Footnotes appear at end of Appendix.

APPENDIX B—continued

| Docket No. | Petitioner | Taxable year | Deficiency | ADDITIONS TO THE TAX | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | I.R.C. sec. 6653(a) | I.R.C. sec. 6653(a)(1) | I.R.C. sec. 6653(a)(2)[1] | I.R.C. sec. 6659 | I.R.C. sec. 6621(c)[2] |
| 14094-86 | Donald G. Wolfcale and Ruthie J. Wolfcale | 1978 | $10,257.00 | $513.00 | | | $3,077.00 | $10,257.00 |
| | | 1981 | 9,932.00 | | $497.00 | $9,932.00 | 2,956.00 | 9,932.00 |
| | | 1982 | 2,184.00 | | 109.00 | 2,184.00 | | 2,184.00 |
| 22292-86 | Josiah E. Smith and Leah L. Smith | 1981 | 27,782.00 | | | | 8,015.00 | |
| | | 1982 | 2,087.00 | | | | | |
| 24301-86 | Robert M. Kehl and Violet H. Kehl | 1982 | 10,333.64 | | 517.00 | 9,710.00 | 2,021.00 | 10,333.64 |
| 24683-86 | Curtis T. Colovos and Susan L. Colovos | 1982 | 338.00 | | 16.90 | 338.00 | | |
| 29693-86 | Donald T. Holland | 1982 | 8,955.00 | | 447.75 | 8,955.00 | 2,686.50 | 8,955.00 |
| 40665-86 | Thomas A. Graham and Celeste F. Graham | 1979 | 1,042.12 | 52.10 | | | 312.63 | 1,042.12 |
| | | 1980 | 3.00 | | | | | |
| | | 1982 | 1,845.00 | | 92.95 | 1,845.00 | | 1,845.00 |

[1] The respondent determined that the addition to tax should be computed on the underpayment of tax set forth in this column.

[2] The respondent determined that the amount of the underpayment of income tax set forth in this column is a substantial underpayment of income tax attributable to a tax-motivated transaction under sec. 6621(c), formerly sec. 6621(d).

[3] Amount was not determined in notice of deficiency.